**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| K.M., a minor, by and through her Guardian Ad Litem, Lynn Bright, *Plaintiff-Appellant*, <br><br> v. <br><br> TUSTIN UNIFIED SCHOOL DISTRICT, *Defendant-Appellee*. | No. 11-56259 <br><br> D.C. No. 8:10-cv-01011-DOC-MLG |

| | |
|---|---|
| D.H., a minor, by and through her Guardian Ad Litem, K.H., *Plaintiff-Appellant*, <br><br> v. <br><br> POWAY UNIFIED SCHOOL DISTRICT, *Defendant-Appellee*. | No. 12-56224 <br><br> D.C. No. 3:09-cv-02621-L-NLS <br><br><br> OPINION |

Appeals from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding (No. 11-56259)
and the Southern District of California
M. James Lorenz, Senior District Judge, Presiding (No. 12-56224)

Argued and Submitted
December 3, 2012—Pasadena, California

Filed August 6, 2013

Before: Marsha S. Berzon, Richard R. Clifton,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

### Americans with Disabilities Act

Reversing the district court's grant of summary judgment in two cases, the panel held that a school district's compliance with its obligations to a deaf or hard-of-hearing child under the Individuals with Disabilities Education Act does not also necessarily establish compliance with its effective communication obligations to that child under Title II of the Americans with Disabilities Act.

The plaintiffs, high schoolers with hearing disabilities who received special education services under the IDEA, alleged that their school districts had an obligation under Title II of the ADA to provide them with a word-for-word transcription service.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected the reasoning that (1) a valid IDEA individualized education program, or IEP, satisfies a regulation promulgated under § 504 of the Rehabilitation Act requiring schools to make available to children with disabilities a free appropriate public education; (2) § 504 and Title II are substantially similar statutes; (3) therefore, a valid IDEA IEP also satisfies Title II. The panel held that compliance with the IDEA does not doom all § 504 claims. In addition, there are material differences between § 504 and Title II of the ADA. According deference to the Department of Justice's interpretation of the ADA effective communication regulation, as expressed in an amicus brief, the panel concluded that the ADA requirements regarding students who are deaf or hard-of-hearing are different than those imposed by the IDEA. The panel reversed the grants of summary judgment on the ADA claims in both cases and on a state law claim in one of the cases and remanded for further proceedings consistent with its opinion.

---

**COUNSEL**

**11-56259**

David Martin Grey (argued), Grey & Grey, Santa Monica, California, for Plaintiff-Appellant.

Jack Byron Clarke, Jr. (argued), Best Best & Krieger LLP, Riverside, California; Cary K. Quan, Declues, Burkett & Thompson, LLP, Huntington Beach, California, for Defendant-Appellee.

Jennifer Levin Eichhorn (argued), United States Department of Justice Civil Rights Division/Appellate Section, for Amicus Curiae United States of America.

Steven Robert Rech, Schwartz, Junell, Greenberg & Oathout, LLP, Houston, Texas, for Amicus Curiae Alexander Graham Bell Association for the Deaf and Hard of Hearing.

Keith L. Wurster, Baker & McKenzie LLP, Palo Alto, California, for Amicus Curiae Council of Parent Attorneys and Advocates, Inc.

**12-56224**

David Martin Grey (argued), Grey & Grey, Santa Monica, California, for Plaintiff-Appellant.

Marlon Craig Wadlington (argued), Atkinson, Andelson, Loya, Ruud & Romo, Cerritos, California, for Defendant-Appellee.

## OPINION

BERZON, Circuit Judge:

These two cases, consolidated for oral argument, raise questions about the obligations of public schools under federal law to students who are deaf or hard-of-hearing. The plaintiffs' central claim is that their school districts have an obligation under the Americans with Disabilities Act ("ADA") to provide them with a word-for-word transcription service so that they can fully understand the teacher and fellow students without undue strain and consequent stress.

K.M., a high schooler in the Tustin Unified School District ("Tustin") in Orange County, California, and D.H., a high schooler in the Poway Unified School District ("Poway") in San Diego County, California, both have hearing disabilities. Each student, through her parents, requested that, to help her follow classroom discussions, her school district provide her with Communication Access Realtime Translation ("CART") in the classroom. CART is a word-for-word transcription service, similar to court reporting, in which a trained stenographer provides real-time captioning that appears on a computer monitor. In both cases, the school district denied the request for CART but offered other accommodations. Also in both cases, the student first unsuccessfully challenged the denial of CART in state administrative proceedings and then filed a lawsuit in federal district court.

In the district court, both K.M. and D.H. claimed that the denial of CART violated both the Individuals with Disabilities Education Act ("IDEA") and Title II of the ADA. In each case, the district court granted summary judgment for the school district, holding that the district had fully complied with the IDEA and that the plaintiff's ADA claim was foreclosed by the failure of her IDEA claim. On appeal, both K.M. and D.H. do not contest the conclusion that their respective school districts complied with the IDEA. They challenge, however, the district courts' grants of summary judgment on their ADA claims, because they maintain that Title II imposes effective communication obligations upon public schools independent of, not coextensive with, schools' obligations under the IDEA.

In light of this litigation history, these appeals present this court with a narrow question: whether a school district's

compliance with its obligations to a deaf or hard-of-hearing child under the IDEA also necessarily establishes compliance with its effective communication obligations to that child under Title II of the ADA. For the reasons explained below, we hold that it does not. We do not find in either statute an indication that Congress intended the statutes to interact in a mechanical fashion in the schools context, automatically pretermitting any Title II claim where a school's IDEA obligation is satisfied. Moreover, in one of these cases, *K.M. v. Tustin*, the Department of Justice ("DOJ") has filed an amicus brief in support of the plaintiff that includes an interpretation of the relevant Title II regulations, to which we accord deference under *Auer v. Robbins*, 519 U.S. 452 (1997), and which bolsters our conclusion.

## FACTUAL AND PROCEDURAL BACKGROUND

### K.M.

Because of her hearing loss, K.M. is eligible for special education services under the IDEA. Her eligibility means that Tustin must provide K.M. with a "free appropriate public education" ("FAPE") suited to her individual needs. *See* 20 U.S.C. § 1412(a)(1). As required by the statute, Tustin has convened regular meetings to develop an annual "individualized education plan" ("IEP") identifying K.M.'s educational goals and laying out which special services Tustin will provide to address those goals in the upcoming academic year. *See id.* § 1412(a)(4).

In spring 2009, when K.M. was completing the eighth grade, Tustin and her parents began to prepare for her upcoming transition to high school. At a June 2009 meeting of K.M.'s IEP team, K.M.'s mother requested that Tustin

provide her with CART beginning the first day of ninth grade, in Fall 2009. K.M.'s long-time auditory-visual therapist recommended that K.M. receive CART in high school. The IEP team deferred a decision on the CART request, instead developing an IEP that offered K.M. other accommodations.

Shortly thereafter, K.M. filed an administrative complaint challenging the June 2009 IEP. During the course of K.M.'s ninth grade year, her parents and Tustin officials met for several IEP meetings but were unable to come to an agreement that would resolve the complaint. After providing K.M. with trials of both CART and an alternative transcription technology called TypeWell, her IEP team concluded that she did not require transcription services to receive a FAPE under the IDEA, *see* 20 U.S.C. § 1412(a)(1), and reaffirmed the June 2009 IEP.

K.M.'s challenge to the June 2009 IEP proceeded to a seven-day hearing before a California administrative law judge ("ALJ"). K.M. testified that she could usually hear her teachers but had trouble hearing her classmates and classroom videos. Several of K.M.'s teachers testified that, in their opinion, K.M. could hear and follow classroom discussion well.

Applying the relevant legal standards, the ALJ concluded that Tustin had complied with both its procedural and substantive obligations under the IDEA and had provided K.M. with a FAPE. The ALJ observed that K.M.'s mother was requesting CART so that K.M. could "maximize her potential," but the IDEA, as interpreted by the Supreme Court in *Board of Education of Hendrick Hudson School District, Westchester County v. Rowley*, 458 U.S. 176 (1982), does not

require schools to provide "a potential-maximizing education."

Dissatisfied, K.M. filed a complaint in district court challenging the ALJ decision on her IDEA claim. She also asserted disability discrimination claims under Section 504 of the Rehabilitation Act, Title II of the ADA, and California's Unruh Civil Rights Act. With respect to her ADA claim, she sought, in addition to other relief, "an Order compelling Defendants to provide CART." The complaint alleges that CART "is commonly paid for by other Southern California public school districts," including the Los Angeles Unified School District and the Santa Monica Malibu School District, and "is also commonly provided at the college level under the ADA."

In declarations submitted to the district court, K.M.'s teachers declared that she participated in classroom discussions comparably to other students. K.M. saw her situation quiet differently, emphasizing that she could only follow along in the classroom with intense concentration, leaving her exhausted at the end of each day.

The district court granted summary judgment for Tustin. First, as to K.M.'s IDEA claim, the district court stated that it was "reluctant to adopt fully teacher and administrator conclusions about K.M.'s comprehension levels over the testimony of K.M. herself," and found "that K.M.'s testimony reveals that her difficulty following discussions may have been greater than her teachers perceived." Nevertheless, the district court agreed with the ALJ that, under the relevant legal standards, K.M. had been afforded a FAPE compliant with the IDEA. Second, the district court held that "K.M.'s claims under the ADA and the Rehabilitation Act fail on the

merits for the same reason that her claim under [the] IDEA failed." Finally, the district court noted that Unruh Act liability requires intentional discrimination or an ADA violation, neither of which K.M. had shown.

This appeal followed, in which K.M. challenges only the district court's rulings on her ADA and Unruh Act claims.[1]

### D.H.

Like K.M., D.H. is eligible for and receives special education services under the IDEA, pursuant to an annual IEP. At an IEP meeting held towards the end of D.H.'s seventh-grade year, D.H.'s parents "agreed . . . that [D.H.] was making progress," but said that they "believed that [she] needed CART in order to have equal access in the classroom." The IEP team decided that CART was not necessary to provide D.H. with a FAPE, noting that D.H. was making good academic progress.

D.H. filed an administrative complaint challenging her April 2009 IEP. During the ensuing hearing, D.H. testified that she sometimes had trouble following class discussions and teacher instructions. The ALJ concluded, however, that Poway had provided D.H. with a FAPE under the IDEA, finding that D.H. "hears enough of what her teachers and fellow pupils say in class to allow her to access the general education curriculum" and "did not need CART services to gain educational benefit."

---

[1] Under California law, "a violation of the ADA is, *per se*, a violation of the Unruh Act." *Lentini v. Calif. Ctr. for the Arts*, 370 F.3d 837, 847 (9th Cir. 2004). We therefore do not discuss K.M.'s Unruh Act claim separately from her ADA claim.

D.H. challenged the ALJ decision on her IDEA claim in district court, and also alleged disability discrimination claims under Section 504 of the Rehabilitation Act and Title II of the ADA, seeking, in addition to other relief, "an Order compelling Defendants to provide CART." Like K.M.'s complaint, D.H.'s complaint alleges that CART is commonly provided by other Southern California school districts and at the college level.

D.H. entered high school in Fall 2010. Before the district court, D.H. submitted a declaration in support of her motion for summary judgment which she declared that she has continued to have difficulty hearing in her classes. Although D.H. can use visual cues to follow conversations, "[u]se of these strategies requires a lot of mental energy and focus," leaving her "drained" at the end of the school day. D.H.'s declaration questioned whether her teachers understood the extra effort it required for her to do well in school.

The district court initially granted partial summary judgment for Poway on D.H.'s IDEA claim, holding that the April 2009 IEP provided a FAPE under the IDEA. Although noting that it was "sympathetic to the parents' view that the CART service would make it easier for [D.H.] to follow the lectures and class discussions," the district court denied the request to order the service, on the ground that "the IDEA does not require States to 'maximize each child's potential . . . .'" Later, the district court granted summary judgment for defendants on D.H.'s remaining — ADA and Section 504 — claims. Relying in part on the earlier district court decision in *K.M. v. Tustin*, the district court held that "a plaintiff's failure to show a deprivation of a FAPE under the IDEA dooms a claim under [Section] 504, and, accordingly, under the ADA."

This appeal, in which D.H. challenges only the district court's ruling on her ADA claim, followed.

## DISCUSSION

### I.  General Statutory Background

Before discussing K.M. and D.H.'s specific claims, we provide some necessary context concerning the three statutes primarily implicated by these appeals, the IDEA, Title II of the ADA, and Section 504 of the Rehabilitation Act, especially as they apply to accommodation of students with communication difficulties.

### A.

The IDEA requires schools to make available to children with disabilities a "free appropriate public education," or "FAPE," tailored to their individual needs. 20 U.S.C. § 1400(d)(1)(A). States receiving federal funds under the IDEA must show that they have implemented "policies and procedures" to provide disabled children with a FAPE, including procedures to develop an IEP for each eligible child. *Id.* § 1412(a), (a)(1), (a)(4).

The IDEA enumerates several general factors that a child's IEP team must consider in developing her IEP. These are "the strengths of the child," "the concerns of the parents for enhancing the education of their child," "the results of the initial evaluation or most recent evaluation of the child," and "the academic, developmental, and functional needs of the child." *Id.* § 1414(d)(3)(A). In addition, the IDEA enumerates "special factors" that must be considered if a child has a

particular type of disability. For a child who is deaf or hard-of-hearing, the IEP team is required to

> consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode[.]

*Id.* § 1414(d)(3)(B)(iv). The IEP team is also required to "consider whether the child needs assistive technology devices and services." *Id.* § 1414(d)(3)(B)(v).

The IDEA does not, however, specify "any substantive standard prescribing the level of education to be accorded handicapped children." *Rowley*, 458 U.S. at 189. Rather, the IDEA primarily provides parents with various procedural safeguards, including the right to participate in IEP meetings and the right to challenge an IEP in state administrative proceedings and, ultimately, in state or federal court. *Rowley* saw the statute as resting on the premise "that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley*, 458 U.S. at 206; *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 59–60 (2005). "The core of the statute . . . is the cooperative process that it establishes between parents and schools." *Schaffer*, 546 U.S. at 53.

The IDEA does have a substantive component, but a fairly modest one: The IEP developed through the required

procedures must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07. The IDEA does not require states to provide disabled children with "a potential-maximizing education." *Id.* at 197 n.21. This access-centered standard means that, for a child being educated in mainstream classrooms, an IEP is substantively valid so long as it is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 204.

**B.**

In contrast to the more process-oriented IDEA, the ADA imposes less elaborate procedural requirements. It also establishes different substantive requirements that public entities must meet.

Title II of the ADA, the title applicable to public services, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, *or be subjected to discrimination by any such entity*," and requires that the DOJ promulgate regulations to implement this provision. 42 U.S.C. §§ 12132, 12134 (emphasis added). We have recognized that, under the principles of deference established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the DOJ's Title II-implementing regulations "should be given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065 (9th Cir. 2010) (internal quotation marks and citations omitted).

Among the DOJ's Title II-implementing regulations, and at the core of these appeals, is the so-called "effective communications regulation," which spells out public entities' communications-related duties towards those with disabilities. *See* 28 C.F.R. § 35.160 (2010).[2] The Title II effective communications regulation states two requirements: First, public entities must "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." *Id.* § 35.160(a). Second, public entities must "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." *Id.* § 35.160(b)(1). The Title II regulations define the phrase "auxiliary aids and services" for purposes of § 35.160 as including, *inter alia*, "real-time computer-aided transcription services" and "videotext displays." *Id.* § 35.104. "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." *Id.* § 35.160(b)(2).

A separate, more general Title II regulation limits the application of these requirements: Notwithstanding any other requirements in the regulations, a public entity need not, under Title II, "take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative

---

[2] The Title II regulations, including § 35.160, were amended effective March 15, 2011, *see* 75 Fed. Reg. 56164-01 (Sept. 15, 2010), but the language we quote was not changed in any substantive way relevant to this appeal.

burdens." *Id.* § 35.164. The public entity has the burden to prove that a proposed action would result in undue burden or fundamental alteration, and the decision "must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion." *Id.* The public entity must "take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity." *Id.*

As should be apparent, the IDEA and Title II differ in both ends and means. Substantively, the IDEA sets only a floor of access to education for children with communications disabilities, but requires school districts to provide the individualized services necessary to get a child to that floor, regardless of the costs, administrative burdens, or program alterations required. Title II and its implementing regulations, taken together, require public entities to take steps towards making existing services not just accessible, but *equally* accessible to people with communication disabilities, but only insofar as doing so does not pose an undue burden or require a fundamental alteration of their programs.

**C.**

Finally, at least as a general matter, public schools must comply with both the IDEA and the ADA. The IDEA obviously governs public schools. There is also no question that public schools are among the public entities governed by Title II. *See* 42 U.S.C. § 12101(a)(3) (listing "education" in

the ADA congressional findings section as one of "critical areas" in which disability discrimination exists); *Tennessee v. Lane*, 541 U.S. 509, 525 (2004) (listing "public education" among the sites of discrimination that Congress intended to reach with Title II).

Moreover, Congress has specifically and clearly provided that the IDEA coexists with the ADA and other federal statutes, rather than swallowing the others. *See Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 872 (9th Cir. 2011) (en banc). After the Supreme Court interpreted an earlier version of the IDEA to provide the "exclusive avenue" for pursuing "an equal protection claim to a publicly financed special education," *Smith v. Robinson*, 468 U.S. 992, 1009 (1984), Congress enacted legislation to overturn that ruling. An amendment to the IDEA, enacted in 1986, clarified that the IDEA does not foreclose any additional constitutional or federal statutory claims that children with disabilities may have, so long as they first exhaust their IDEA claims through the IDEA administrative process. *See* Pub. L. 99-372, 100 Stat. 796 (1986); *see also Mark H. v. Lemahieu*, 513 F.3d 922, 934 (9th Cir. 2008). In its current version, the IDEA non-exclusivity provision reads:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 *et seq*.], title V of the Rehabilitation Act of 1973 [29 U.S.C. § 791 *et seq*.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under

this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l) (alterations in original).

**D.**

It is against this statutory background that we shall consider how the IDEA and Title II interact with respect to school districts' obligations to IDEA-eligible students, like K.M. and D.H., who are deaf or hard-of-hearing. First, however, we must clarify one way in which the statutes do not interact.

In the district court's analysis in *K.M.*, relied upon by the district court in *D.H.*, the plaintiffs' ADA claims were tethered to their IDEA claims through the connective thread of a third federal statute, Section 504 of the Rehabilitation Act. Section 504 bars the exclusion of individuals with disabilities from any program or activity receiving federal funds. *See* 29 U.S.C. § 794(a). The district court in *K.M.* reasoned that "the fact that K.M. has failed to show a deprivation of a FAPE under IDEA . . . dooms her claim under Section 504, and, *accordingly*, her ADA claim" (emphasis added). Similarly, the district court in *D.H.* reasoned that "a plaintiff's failure to show a deprivation of a FAPE under the IDEA dooms a claim under [Section] 504, and, *accordingly*, under the ADA" (emphasis added).

The district courts arrived at this reasoning by combining two lines of our case law. In the first line of cases, we have identified a partial overlap between the statutory FAPE

provision under the IDEA and a similar provision within the Section 504 regulations promulgated by the Department of Education, requiring schools receiving federal funds to provide "a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction." 34 C.F.R. § 104.33(a). Although both the IDEA and the Section 504 regulation use the locution "free appropriate public education," or "FAPE," we have concluded that the two FAPE requirements are "overlapping but different." *See Mark H.*, 513 F.3d at 925, 933.[3] At the same time, we have noted that, as provided by the Section 504 FAPE regulation, "adopting a valid IDEA IEP is sufficient but not necessary to satisfy the [Section] 504 FAPE requirements." *Id.* at 933 (citing 34 C.F.R. § 104.33(b)(2)); *see also A.M. v. Monrovia Unified Sch. Dist.*, 627 F.3d 773, 782 (9th Cir. 2010).

In the second line of cases, we have discussed the close relationship between Section 504 and Title II of the ADA. Congress used the earlier-enacted Section 504 as a model when drafting Title II. *See Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). We have observed on occasion that "there is no significant difference in the analysis of rights and obligations created by the two Acts." *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

Combining these two lines of cases, the district courts reasoned that (1) a valid IDEA IEP satisfies the Section 504 FAPE regulation; (2) Section 504 and Title II are

---

[3] Most importantly, the Section 504 regulations define FAPE "to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focus[] on the 'design' of a child's educational program," while the IDEA definition of FAPE does not require a comparative analysis. *Id.* at 933.

substantially similar statutes; (3) therefore, a valid IDEA IEP also satisfies Title II. This syllogism overstates the connections both between the IDEA and Section 504, and between Section 504 and Title II.

First, we have never held that compliance with the IDEA dooms *all* Section 504 claims. In *Mark H.*, we held only that "adopting a valid IDEA IEP is sufficient . . . to satisfy the [Section] 504 *FAPE requirements*." 513 F.3d at 925 (emphasis added) (citing 34 C.F.R. § 104.33(b)(2)). We so held because the Section 504 FAPE regulation itself provides that provision of a FAPE under the IDEA "is one means of meeting *the standard established in paragraph (b)(1)(i)* of this section," 34 C.F.R. § 104.33(b)(2) (emphasis added), i.e., the Section 504 FAPE standard. Because a school district's provision of a FAPE under the IDEA meets Section 504 FAPE requirements, a claim predicated on finding a violation of the Section 504 FAPE standard will fail if the IDEA FAPE requirement has been met. Section 504 claims predicated on other theories of liability under that statute and its implementing regulations, however, are not precluded by a determination that the student has been provided an IDEA FAPE.

Second, the connection between Title II and Section 504 is nuanced. Although the general anti-discrimination mandates in the two statutes are worded similarly, there are material differences between the statutes as a whole. First, their jurisdictions, while overlapping, are not coextensive: Section 504 governs all entities receiving federal funds (public or private), while Title II governs all public entities (federally funded or not). *Compare* 29 U.S.C. § 794 *with* 42 U.S.C. § 12132. Second, Title II's prohibition of discrimination or denial of benefits "by reason of" disability

"establishes a 'motivating factor' causal standard for liability when there are two or more possible reasons for the challenged decision and at least one of them may be legitimate." *Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1048–49 (9th Cir. 2009). In other words, "if the evidence could support a finding that there is more than one reason for an allegedly discriminatory decision, a plaintiff need show only that discrimination on the basis of disability was a 'motivating factor' for the decision." *Id.* By contrast, "[t]he causal standard for the Rehabilitation Act is even stricter," *id.*, requiring a plaintiff to show a denial of services "solely by reason of" disability. 29 U.S.C. § 794(a).

Congress has also delegated regulatory responsibility differently under the two statutes. Section 504 mandates generally that the head of each executive agency must promulgate its own regulations "as may be necessary" to implement Section 504's nondiscrimination mandate with respect to that agency's programs. *See* 29 U.S.C. § 794(a). Thus, for example, the Department of Education promulgates regulations implementing Section 504 with respect to federally funded education programs. *See generally* 34 C.F.R. part 104. For Title II, Congress made a more specific, and centralized, delegation, confiding regulatory authority wholly in the Justice Department. *See* 42 U.S.C. § 12134(a).

Congress also mandated that the federal regulations implementing Title II be consistent with certain, but not all, of the regulations enforcing Section 504. *See id.* § 12134(b). Specifically, Congress mandated that the Title II regulations as to all topics "[e]xcept for 'program accessibility, existing facilities,' and 'communications'" be consistent with the Section 504 regulations codified at 28 C.F.R. part 41, and that the Title II regulations as to "'program accessibility, existing

facilities,' and 'communications'" be consistent with the Section 504 regulations codified at 28 C.F.R. part 39. *Id.* Congress did not, however, mandate that Title II regulations be consistent with the Section 504 *FAPE* regulation, which is codified at 34 C.F.R. part 104.

Neither K.M. nor D.H.'s theory of Title II liability is predicated on a denial of FAPE under any definition of that term; indeed, Title II does not impose any FAPE requirement. Rather, both K.M. and D.H. ground their claims in the Title II effective communications regulation, which they argue establishes independent obligations on the part of public schools to students who are deaf or hard-of-hearing. Insofar as the Title II effective communications regulation has a Section 504 analog, it is not the Section 504 FAPE regulation at 34 C.F.R. § 104.33 we construed in the *Mark H.* line of cases. Rather, it is the Section 504 communications regulation at 28 C.F.R. § 39.160, as that is the regulation with which Congress has specified that Title II communications regulations must be consistent. *See* 42 U.S.C. § 12134(b).

## II. The IDEA and ADA Communications Provisions

### A.

The question whether a school meets the ADA's requirements for accommodating deaf or hard-of-hearing students as long as it provides a FAPE for such students in accord with the IDEA is therefore one that cannot be answered through any general principles concerning the overall relationship between the two statutes. Instead, we must address the question by comparing the *particular* provisions of the ADA and the IDEA covering students who are deaf or hard-of-hearing, as well as the implementing

regulations for those provisions. If the ADA requirements are sufficiently different from, and in some relevant respect more stringent than, those imposed by the IDEA, then compliance with the IDEA FAPE requirement would not preclude an ADA claim. Because we have no cases addressing the parallelism between the IDEA and either the Title II effective communications regulation or its analogous Section 504 regulation, we must construe the relevant statutes and regulations as a question of first impression.

In doing so, "[w]e afford . . . considerable respect" to the DOJ's interpretation of the ADA effective communication regulation, as expressed in its amicus brief to this court. *M.R. v. Dreyfus*, 697 F.3d 706, 735 (9th Cir. 2011). "An agency's interpretation of its own regulation is 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Auer*, 519 U.S. at 461) (other citations omitted).[4] Applying that standard, we conclude from our comparison of the relevant statutory and regulatory texts that the IDEA FAPE requirement and the Title II communication requirements are significantly different. The result is that in some situations, but not others, schools may be required under the ADA to provide services to deaf or hard-of-hearing students that are different than the services required by the IDEA.

---

[4] *Auer* deference does not apply where the regulation at issue "does little more than restate the terms of the statute itself." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006). That exception is inapplicable here, where, as in *Auer*, the regulation does not parrot the statute but rather "[gives] specificity to a statutory scheme the [DOJ] was charged with enforcing." *Id.* at 256 (construing *Auer*).

*First*, the factors that the public entity must consider in deciding what accommodations to provide deaf or hard-of-hearing children are different. The key variables in the IDEA framework are the child's "needs" and "opportunities." When developing a deaf or hard-of-hearing child's IEP for IDEA purposes, the IEP team is required to consider, among other factors, "the child's language and communication *needs*," "*opportunities* for direct communications with peers and professional personnel in the child's language and communication mode," and "whether the child *needs* assistive technology devices and services." 20 U.S.C. § 1414(d)(3)(B)(iv)&(v) (emphases added). Under the ADA effective communications regulation, a public entity is also required to "furnish appropriate auxiliary aids and services *where necessary*." 28 C.F.R. § 35.160(b)(1) (emphasis added). But the ADA adds another variable: In determining how it will meet the child's needs, the ADA regulations require that the public entity "give primary consideration to the *requests* of the individual with disabilities." *Id.* § 35.160(b)(2) (emphasis added).[5] That provision has no direct counterpart in the IDEA. Although the IDEA requires schools to consult with parents and to include the child in IEP meetings "whenever appropriate," 20 U.S.C. § 1414(d)(1)(B)(vii), it does not require that parental or child requests be assigned "primary" weight. *Cf. Bradley ex rel. Bradley v. Ark. Dep't of Ed.*, 443 F.3d 965, 975 (8th Cir. 2006) ("[T]he IDEA does not require that parental preferences be implemented, so long as the IEP is reasonably calculated to provide some educational benefit.").

---

[5] Where the individual is a minor, as will generally be the case in the schools context, we assume that such requests would ordinarily be made via the parent. We do not decide whether the child's preferences might trump the parent's in a situation in which they disagreed.

*Second*, Title II provides the public entity with defenses unavailable under the IDEA. Specifically, Title II "does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.164. In particular, as the DOJ explained in its amicus brief to this court, the ADA effective communication obligation "is limited to the provision of services for *existing programs*; the ADA does not require a school to provide new programs or new curricula" (emphasis in original). The IDEA does not provide schools with any analog to Title II's fundamental alteration and undue burden defenses.

*Third*, the specific regulation at issue here, the Title II effective communications regulation, requires public schools to communicate "as effective[ly]" with disabled students as with other students, and to provide disabled students the "auxiliary aids . . . necessary to afford . . . an *equal opportunity* to participate in, and enjoy the benefits of," the school program. 28 C.F.R. §§ 35.160(a)(1) & (b)(1) (emphasis added). That requirement is not relevant to IDEA claims, as the IDEA does not require schools to "provide 'equal' educational opportunities" to all students. *Rowley*, 458 U.S. at 198.

Given these differences between the two statutes, we are unable to articulate any unified theory for how they will interact in particular cases. Precisely because we are unable to do so, we must reject the argument that the success or failure of a student's IDEA claim dictates, as a matter of law, the success or failure of her Title II claim. As a result, courts evaluating claims under the IDEA and Title II must analyze each claim separately under the relevant statutory and

regulatory framework. We note, however, that nothing in our holding should be understood to bar district courts from applying ordinary principles of issue and claim preclusion in cases raising both IDEA and Title II claims where the IDEA administrative appeals process has functionally adjudicated some or all questions relevant to a Title II claim in a way that precludes relitigation. *Cf. Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290–97 (5th Cir. 2005) (en banc) (holding that ADA and Section 504 claims were issue-precluded by failure of IDEA claims based on identical accessibility guidelines); *Indep. Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir. 1996) (when IDEA claims are exhausted through the administrative process, "principles of issue and claim preclusion may properly be applied to short-circuit redundant claims under other laws").

## B.

Both school districts make one final argument that requires a brief response. They argue that, even if analyzed independently under Title II, K.M. and D.H.'s claims must fail because ADA liability requires plaintiffs to show that they were denied "meaningful access" to school services, programs, or activities, and that they cannot make this showing. The phrase "meaningful access" derives not from the text of the ADA or its implementing regulations, but from the Supreme Court's opinion in *Alexander v. Choate*, 469 U.S. 287 (1985).

*Choate* involved a class-action lawsuit brought by individuals with disabilities who argued that cost-saving measures to Tennessee's Medicaid program would disproportionately affect them and therefore amounted to impermissible discrimination under Section 504. *Id.* at 289.

Rejecting both the contention that Section 504 reaches only purposeful discrimination and "the boundless notion that all disparate-impact showings constitute prima facie cases under [Section] 504," the Court construed Section 504 as including a "meaningful access" standard that identified which disparate-impact showings rise to the level of actionable discrimination. *Id.* at 299. In construing Section 504 in this manner, the Court considered and relied on the regulations applicable to Section 504. *Id.* at 304–05 & n.24.

We have relied on *Choate*'s construction of Section 504 in ADA Title II cases, and have held that to challenge a facially neutral government policy on the ground that it has a disparate impact on people with disabilities, the policy must have the effect of denying meaningful access to public services. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996). As in *Choate*, in considering Title II's "meaningful access" requirement, we are guided by the relevant regulations interpreting Title II. *See Duvall*, 260 F.3d at 1136; *accord Chisolm v. McManimon*, 275 F.3d 315, 325–36 (3d Cir. 2001). Consequently, in determining whether K.M. and D.H. were denied meaningful access to the school's benefits and services, we are guided by the specific standards of the Title II effective communications regulation.[6]

In other words, the "meaningful access" standard incorporates rather than supersedes applicable interpretive regulations, and so does not preclude K.M. and D.H. from

---

[6] Neither school district has argued that the effective communications regulation is an impermissible application of Title II, including its meaningful access standard. Our court has applied the regulation before. *E.g. Duvall*, 260 F.3d 1124. As no party has challenged it, we do not address the regulation's validity.

litigating their claims under those regulations. The school districts' suggestion to the contrary therefore fails.

### III.     Application to This Case

Finally, we return to the specifics of the cases before us in this appeal. Here, in both cases, the district court held that the plaintiff's Title II claim was foreclosed as a matter of law by the failure of her IDEA claim. For the reasons explained above, the district courts legally erred in granting summary judgment on that basis. The failure of an IDEA claim does not automatically foreclose a Title II claim grounded in the Title II effective communications regulation.

Although we could review the record to determine whether there are alternate legal or factual grounds on which to affirm summary judgment, *see Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 956 (9th Cir. 2009), we are not bound to do so, *see Badea v. Cox*, 931 F.2d 573, 575 n.2 (9th Cir. 1991). In *Mark H.*, for example, we reversed a grant of summary judgment where the parties and the district court had misunderstood the interaction between two federal statutes, and remanded for further proceedings consistent with the relationship between those statutes as newly clarified by our opinion. *Mark H.*, 513 F.3d at 925, 939–40.

Here too, prudence counsels in favor of returning these cases to the district court for further proceedings. Having granted summary judgment on legal grounds, neither district court considered whether there was a genuine issue of material fact as to the school districts' compliance with Title II. Moreover, the school districts have litigated these cases thus far from the position that the plaintiffs' IDEA and Title

II claims were coextensive.**[7]** Now that we have clarified that the school districts' position is not correct, we expect that the parties may wish to further develop the factual record and, if necessary, revise their legal positions to address the specifics of a Title II as opposed to an IDEA claim.

To give the district courts an opportunity to consider the merits of K.M. and D.H.'s Title II claims in the first instance, we reverse the grants of summary judgment on the ADA claims in both cases and on the Unruh Act claim in *K.M. v. Tustin*, and remand for further proceedings consistent with this opinion, without prejudice to whether the school districts may renew their motions for summary judgment on other grounds.**[8]**

## CONCLUSION

For the foregoing reasons, we **REVERSE** the grants of summary judgment on the ADA claims in both cases and on

---

**[7]** Although they made Title II-specific arguments in the alternative, the IDEA claims were clearly the focus of their litigation efforts. Their Title II defenses relied on arguments more properly related to the plaintiffs' IDEA claims, such as whether the plaintiffs had been provided with a FAPE.

**[8]** The Third Circuit has observed in a somewhat similar Title II communications case that, "[g]enerally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment." *Chisolm*, 275 F.3d at 327; *see also Duvall*, 260 F.3d at 1136–38. In the education context, Title II communications claims may conceivably be more amenable to summary judgment given the extensive factual record that will often have been developed through IEP meetings and administrative appeals. We do not, at this juncture, express any general opinion on this question.

the Unruh Act claim in *K.M. v. Tustin*, and **REMAND** for further proceedings in both cases consistent with this opinion.