# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 28, 2014

Lyle W. Cayce
Clerk

No. 12-41139

ESTATE OF MONTANA LANCE; JASON LANCE; DEBORAH LANCE,

Plaintiffs-Appellants

v.

LEWISVILLE INDEPENDENT SCHOOL DISTRICT,

Defendant-Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before REAVLEY, DAVIS, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

When he was in the fourth grade, Montana Lance locked himself inside of the school nurse's bathroom and took his own life. Montana was a special-needs student, and Montana's parents sued the Lewisville Independent School District (the "School District") alleging, among other claims, that the School District violated Montana's constitutional rights under 42 U.S.C. § 1983 and discriminated against him because of his disabilities under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The district court granted summary judgment, and because the evidence does not create a genuine issue of material fact as to these claims, we AFFIRM.

No. 12-41139

## FACTS AND PROCEEDINGS

The School District holds an Admission, Review, and Dismissal committee ("ARD") meeting to decide whether a student qualifies for special education services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482 (2012). The ARD found that Montana qualified for special services under IDEA to accommodate his speech impediment (a lisp), learning disability (Attention Deficit Hyperactivity Disorder), and, eventually, his emotional disturbance. Accordingly, the ARD developed an Individual Education Plan ("IEP") and a Behavioral Improvement Plan ("BIP") for Montana while he attended Stewart's Creek Elementary School ("Stewart's Creek"). Beginning when Montana was in kindergarten, Stewart's Creek provided Montana speech therapy, dyslexia services, and counseling.[1] Montana was troubled, and when he was in second grade his mother informed a teacher that "he was making verbal statements about hurting himself at home." Accordingly, the ARD requested that Montana undergo a full psychological evaluation. A psychologist reviewing Montana's test results concluded that Montana should be identified as "Emotionally Disturbed."

Montana's peers picked on him at school. One documented altercation took place on November 4, 2009 when "[a] student verbally provoked (or tried to) Montana." "Montana responded 'I'm not afraid of you,'" pushed the student, and the student then "pushed Montana into a stack of chairs." In another altercation on December 18, 2009, Montana pulled out a pocketknife. Montana was playing outside when, according to Montana, another student told him to stop playing like a ninja. Montana told this student that he was a "bully." A

---

[1] The Lances consistently agreed with the ARD's decisions throughout Montana's education at Stewart's Creek.

No. 12-41139

second student then said "beat [Montana] up again" and the first student picked up Montana and moved him. Montana explained, "I just pulled out my knife, but I didn't know it was there."

In response to the December incident, the School District placed Montana in the Disciplinary Alternative Education Program ("DAEP") for ten days. Montana's mother wrote the principal a letter arguing that the ten-day transfer was too harsh: "Montana was being bullied by other students and felt fearful. The other students actually picked Montana off of his feet." Mrs. Lance also wrote the Superintendent, explaining that Montana liked DAEP because "he has not experienced the hazing and bullying from the other students in contrast to the experiences he has at his home campus [at Stewart's Creek]." Accordingly, Mrs. Lance wrote, "I am concerned that this is more of a reward to my child than a punishment." The School District reduced Montana's time in DAEP to eight days.

On January 4, 2010, Montana began his time at DAEP and met with a school psychologist, Dr. Kelly Lawrence, for individual counseling. On January 12, 2010, Montana told his DAEP teacher that "he wanted to kill himself." Counselor Mike Riek met with Montana and notified Mr. Lance that Montana had made suicidal statements. Riek concluded that the "lethality" of Montana's statements was low. The Lances arranged for Montana to meet with psychologist Katie Besly. On January 18, 2010, Besly met with Montana. Besly testified that Montana "did not give any indication that he was intending to end his life." On January 19, 2010, Montana returned to Stewart's Creek. On January 21, 2010, Montana and classmates had another altercation. According to a classmate, Montana was in the breakfast line and "he was called a name." Montana "told the bullies to stop it, and he was shoved into the rods." Montana "stormed off and sat by himself at an empty table." Later in the day a substitute

3

teacher sent Montana and his classmate to the office for "talking" and "using profanity." Montana then met with the assistant principal, Amy Teddy.

As required of all students who are sent to the office, Montana was allowed to use only the nurse's bathroom. Montana was using the nurse's bathroom when a significant amount of time passed. The nurse checked on Montana, and he said "he'd be right out," but Montana soon stopped responding to the nurse's inquiries. The nurse did not have a key to unlock the door and called the custodian. The custodian did not have a key either. The custodian then opened the door with a screwdriver. Upon entering the bathroom, the nurse and custodian found Montana hanging from his belt, which was secured to a metal rod in the ceiling. Montana had no pulse and was pronounced dead upon arrival at the hospital.

The Lances sued the School District, alleging claims under § 1983, § 504, and Texas law. The School District moved to dismiss the Lances' § 1983 claims and claims for punitive damages. The magistrate judge recommended denying the School District's motion to dismiss the Lances' § 1983 claims based on a "special-relationship theory" but recommended dismissing the Lances' § 1983 claims based on a "state-created danger" theory and dismissing the Lances' claims for punitive damages. The district court adopted the report and recommendation. The School District then filed, among other motions, motions for summary judgment on the Lances' § 504 claims and special-relationship based § 1983 claims. The magistrate judge recommended, among other things, granting the School District's summary-judgment motions. The district court overruled the parties' objections and adopted the report and recommendation. The Lances timely appealed.

## STANDARDS OF REVIEW

"We review a grant of summary judgment *de novo*, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable

No. 12-41139

inferences in that party's favor." *Pierce v. Dep't of the U.S. Air Force*, 512 F.3d 184, 186 (5th Cir. 2007). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ANALYSIS

The Lances argue that they have raised fact issues as to their § 504 claims and their § 1983 claims.

### I.

The Lances' disability discrimination claims implicate three sources of federal law: IDEA, the Americans with Disabilities Act ("ADA"), and § 504. These statutes form a triptych in the school setting, guiding school administrators on how to best serve special-needs students.

### A.

"IDEA requires states and local educational agencies receiving federal IDEA funds to make a [free appropriate public education] available to children with certain disabilities between the ages of 3 and 21." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290–91 (5th Cir. 2005) (en banc). Specifically, IDEA requires each federally funded school district to:

> (1) provide each disabled child within its jurisdictional boundaries with a "free appropriate public education" [a "FAPE"] tailored to his unique needs, and (2) assure that such education is offered, to the greatest extent possible, in the educational "mainstream," that is, side by side with non-disabled children, in the least restrictive environment [the "LRE"] consistent with the disabled student's needs.

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir. 1997) (footnote omitted); 20 U.S.C. §§ 1400(d)(1)(A), 1412(5). To achieve these goals, school districts—through an ARD—must implement an IEP, which is "a written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians,

and when appropriate, the child himself." *Cypress-Fairbanks*, 118 F.3d at 247. An IEP need not "maximize the child's educational potential"; it "guarantees only a basic floor of opportunity for every disabled child, consisting of specialized instruction and related services which are individually designed to provide educational benefit." *Id.* at 247–48 (internal quotation marks omitted); *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 203–04 (1982). The IEP process is a collaborative effort, and the student's parents are guaranteed procedural safeguards to ensure their involvement in the creation and implementation of their child's IEP. *See, e.g.*, 20 U.S.C. §§ 1400(d)(1)(B) ("The purposes of this chapter are . . . to ensure that the rights of children with disabilities and parents of such children are protected."), 1414(c)(3), 1415(a).

Section 504 is an antidiscrimination statute; and, "[a]dmittedly different from those underlying the IDEA, the Congressional objective of . . . § 504 is the elimination of discrimination against individuals with disabilities." *Pace*, 403 F.3d at 291. Section 504 mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).[2] This provision "broadly prohibit[s]

---

[2] Section 504 provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, *solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination* under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978.

29 U.S.C. § 794(a) (emphasis added).

discrimination against disabled persons in federally assisted programs or activities." *D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010); *see also M.P. ex rel. K. & D.P. v. Indep. Sch. Dist. No. 721, New Prague, Minn.*, 439 F.3d 865, 867 (8th Cir. 2006) ("Section 504 is a proscriptive, anti-discrimination statute that prohibits discrimination on the part of governmental actors to avoid due process and equal protection violations."); *see generally Ruecker v. Sommer*, 567 F. Supp. 2d 1276, 1288 (D. Or. 2007) (providing a comprehensive overview of IDEA and § 504). In the school setting, "[t]his court has previously determined that a cause of action is stated under § 504 when it is alleged that a school district has *refused* to provide reasonable accommodations for the handicapped plaintiff to receive the full benefits of the school program." *Marvin H v. Austin Indep. Sch. Dist.*, 714 F.2d 1348, 1356 (5th Cir. 1983).  As with § 504, Title II of the Americans with Disability Act is also an antidiscrimination statute. As such, "this court has equated liability standards under § 504 and the ADA." *D.A.*, 629 F.3d at 453.[3]

---

[3] Title II of the ADA provides, in pertinent part, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under the ADA, a plaintiff must demonstrate: "(1) that she is a qualified individual within the meaning of the ADA; (2) that she was excluded from participation in, or was denied benefits of, services, programs, or activities for which [the school district] is responsible; and (3) that such exclusion or discrimination is because of her disability." *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 292 (5th Cir. 2012). The only "material difference" between § 504 and Title II of the ADA "lies in their respective causation requirements." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity. . . ." 29 U.S.C. § 794(a) (emphasis added). Under Title II of the ADA, however, "'discrimination need not be the sole reason' for the exclusion of or denial of benefits to the plaintiff." *Bennett-Nelson*, 431 F.3d at 454 (quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503–04 (5th Cir. 2002)). The Lances do not bring a claim under the ADA.

No. 12-41139

The Lances' § 504 claims highlight two differences between § 504 and IDEA. First, § 504 and IDEA define disability differently. *Compare* 20 U.S.C. § 1401(3)(a) *with* 34 C.F.R. § 104.3(j)(1). Accordingly, while students may qualify for special services under IDEA and also for protection under § 504, some students may qualify for § 504 protection but not qualify for special services under IDEA. *See Ellenberg v. N.M. Military Inst.*, 572 F.3d 815, 819–23 (10th Cir. 2009) (warning against "conflat[ing] the definition of a 'disabled' child under the IDEA with the definition of a 'handicapped person' under Section 504" and noting that "Section 504 has a broader scope than the IDEA: while the IDEA focuses on the provision of appropriate public education to disabled children, Section 504 addresses the provision of state services to disabled individuals generally"); *Muller ex rel. Muller v. Comm. on Special Educ.*, 145 F.3d 95, 99 & n.2 (2d Cir. 1998) ("For example, § 504's reach extends not only to individuals who in fact have a disability, but also to individuals who are regarded as having such a disability (whether or not that perception is correct)."); *see also* Mark C. Weber, *Procedures and Remedies under Section 504 and the ADA for Public School Children with Disabilities*, 32 J. Nat'l Ass'n Admin. L. Judiciary 611, 618–19 (2012) (noting that the ADA Amendments Act "dramatically expand[ed] the coverage of the ADA and section 504 with respect to elementary and secondary students" but that "IDEA's more restrictive coverage provisions remain unchanged, so the Amendments Act creates the likelihood there will be a large class of children eligible under the ADA and section 504 who are not covered by IDEA").

Second, IDEA and § 504 define FAPE differently. IDEA's statutory definition of FAPE requires that a student's IEP be "reasonably calculated to enable the child to receive educational benefits." *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 378 (5th Cir. 2003) (quoting *Rowley*, 458 U.S. at 206–07). Conversely, § 504 does not have a statutory definition of

No. 12-41139

FAPE; instead, it is § 504's accompanying regulations that require school districts to provide qualifying students a FAPE. Section 504's regulations provide that a school district satisfies the FAPE requirement when it provides services "designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met." 34 C.F.R. § 104.33(b)(1). The Department of Education described § 504's FAPE requirement as "generally conform[ing] to the standards established for the education of handicapped persons in [IDEA]." Department of Education, Establishment and Title and Chapters, 45 Fed. Reg. 92, 30951 (May 9, 1980); *see Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008) ("Although overlapping in some respects, the two requirements contain significant differences."). One circuit has noted that "unlike FAPE under the IDEA, FAPE under § 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of a child's educational program." *Mark H.*, 513 F.3d at 933; *see also K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1097–1100 (9th Cir. 2013). Section 504's regulations further provide that establishing an IEP under IDEA is one method for a school district to satisfy the substantive § 504 FAPE requirement. *See* 34 C.F.R. § 104.33(b)(2) ("Implementation of an [IEP under IDEA] is one means of meeting the standard" for § 504 FAPE); 34 C.F.R. Part 104, App. A to Part 104—Analysis of Final Regulation ("A new § 104.33(b)(2) has been added, which allows this requirement to be met through the full implementation of an individualized education program developed in accordance with the standards of [IDEA].").

**B.**

Against this backdrop, the Lances invoke § 504. The Lances' first § 504 theory is that that the School District acted with gross professional misjudgment by failing to provide Montana educational services necessary to

satisfy § 504's FAPE requirement (the "failure-to-provide" claim). To prevail on this claim the Lances must show that the School District "*refused* to provide reasonable accommodations for the handicapped plaintiff to receive the full benefits of the school program." *Marvin H.*, 714 F.2d at 1356.

## 1.

While they concede that Montana qualified for special services under IDEA and that the School District implemented an IEP, the Lances' complaint does not allege that Montana was denied a FAPE under IDEA; instead, they argue that Montana was denied a FAPE as defined by § 504's regulations. The Lances' failure-to-provide claims, thus, are predicated on the correctness of their contention that they "do not need to establish a violation of IDEA in order to show Montana was denied a FAPE under § 504."[4]

In *D.A.* we endorsed the view that "to establish a claim for disability discrimination, in th[e] education context, 'something more than a mere failure to provide the 'free appropriate education' *required by [IDEA] must be shown.*" *D.A.*, 629 F.3d at 454 (emphasis added) (quoting *Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir. 1982)). At a minimum, then, the Lances are required to allege a denial of a FAPE under IDEA to sustain a § 504 claim based on the denial of a § 504 FAPE because "§ 504 regulations distinctly state that adopting a valid IEP is sufficient but not necessary to satisfy the § 504 FAPE requirements." *Mark H.*, 513 F.3d at 933; *see* 34 C.F.R. § 104.33(b)(2); 34 C.F.R. § 104.36; Seth M. Galanter, *Dear Colleague Letter*, n.8 (Jan. 25, 2013),

---

[4] In their reply the Lances assert—for seemingly the first time, and in any event in the alternative—that the School District's actions "would constitute a violation under the IDEA." But "we do not generally consider issues raised for the first time in a reply brief." *Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 347 n.5 (5th Cir. 2008). Again, the Lances did not allege that the School District violated IDEA in their complaint, and, as discussed below, the Lances never appealed any ARD decision and there is nothing in the record to support that the School District violated IDEA.

http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201301-504.html ("One way to meet the Section 504 FAPE obligation is to implement an individualized education program (IEP) developed in accordance with the IDEA."); *see also  K.M.*, 725 F.3d at 1099 ("Because a school district's provision of a FAPE under the IDEA meets Section 504 FAPE requirements, a claim predicated on finding a violation of the Section 504 FAPE standard will fail if the IDEA FAPE requirement has been met."); *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 216 n.10 (2d Cir. 2012) (noting that the § 504 FAPE "obligation can be satisfied by, *inter alia*, providing the student an IEP"); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 n.8 (3d Cir. 2012) ("[O]ur finding that the School District did not deny D.K. a FAPE [under IDEA] is equally dispositive of Plaintiffs' § 504 claim."); *D.A.*, 629 F.3d at 454 ("Thus, the resolution of an IDEA claim in the school district's favor will frequently preclude parents' resort to redundant claims under § 504 and ADA."); *A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist.*, 627 F.3d 773, 782 (9th Cir. 2010) ("[A] school may establish compliance with Section 504 by implementing a valid IEP."); *Miller ex rel S.M. v. Bd. of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1246 (10th Cir. 2009) ("The mere fact that complying with the IDEA is *sufficient* to disprove educational discrimination does not mean that every violation of the IDEA necessarily *proves* a discrimination claim."); *N.L. ex rel. Mrs. C. v. Knox Cnty. Schs.*, 315 F.3d 688, 695–96 (6th Cir. 2003) ("[P]recedent has firmly established that section 504 claims are dismissed when IDEA claims brought on the theory of a denial of free appropriate public education are also dismissed. These holdings make sense in light of section 504's general applicability and its status as an anti-discrimination statute."); *Kimble v. Douglas Cnty. Sch. Dist. RE-1*, 925 F. Supp. 2d 1176, 1182 (D. Colo. 2013) ("Department of Education's regulations provide that implementing an IEP

No. 12-41139

that provides a FAPE under the IDEA is sufficient, but not necessary, to satisfy the FAPE requirements of Section 504."); *cf. Pace*, 403 F.3d at 297.

We take care here to explain the limits of this requirement. *First*, "[f]ailing to provide a FAPE in violation of the IDEA . . . is not the sole basis on which a student may bring a claim of discrimination under the ADA and [§ 504]." *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013); 20 U.S.C. § 1415(l) ("Nothing in this Chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the [ADA or § 504]."). Instead, § 504 claims "predicated on other theories of liability under that statute and its implementing regulations . . . are not precluded by a determination that the student has been provided an IDEA FAPE." *K.M.*, 725 F.3d at 1099. Section 504 is an antidiscrimination statute; therefore, "even if plaintiffs conceded that [the School District] fully satisfied its IDEA obligations . . . they could pursue claims under the ADA and the [§ 504] on the grounds that [the student] was precluded from receiving a state benefit . . . provided to her non-disabled peers." *Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1281–82 (10th Cir. 2007); *see also M.P.*, 439 F.3d at 867–68 (collecting examples of successful § 504 claims). In this case, for instance, the Lances' peer-on-peer harassment claim is not necessarily predicated on the denial of FAPE. *See* 34 C.F.R. § 104.4(b)(1)(i)–(iv), (vii), (2), (3); Galanter, *Dear Colleague Letter*, (Jan. 25, 2013), n.7 (noting that "[a]mong the many specific applications of these general requirements, Section 504 prohibits harassment on the basis of disability").[5]

---

[5] *See also M.P.*, 439 F.3d at 868 ("The School District's alleged failure to protect M.P. from unlawful discrimination on the basis of his disability is a claim that is wholly unrelated to the IEP process, which involves individual identification, evaluation, educational placement, and free, appropriate education (FAPE) decisions."); *Mark C. Weber, Disability Harassment in the Public Schools*, 43 Wm. & Mary L. Rev. 1079, 1112 (2002) (contending that "[t]he emphasis in [IDEA] on educational and related services and the gaps in the

No. 12-41139

*Second*, a School District would never be able to invoke the sufficiency of its implemented IEP for students who qualify under § 504 but do not qualify for services under IDEA—there would be no IEP to implement. *See, e.g.*, *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60 (2d Cir. 2000); Galanter*, Dear Colleague Letter*, (Jan. 25, 2013) (providing an example of a successful § 504 action against the school district for failing to provide special-needs assistance for a student who is not eligible for services under IDEA).

### 2.

Applied here, the Lances cannot sustain their § 504 FAPE claim because the School District "implement[ed] . . . an Individualized Education Program developed in accordance with [IDEA.]" 34 C.F.R. § 104.33(b)(2).[6] The Lances do not allege that Montana's IEP was developed contrary to IDEA, nor would we perceive such an IDEA violation on this record.

First, the Lances consented to the design and implementation of Montana's IEP and BIP at every stage of Montana's time at Stewart's Creek and they never raised any concerns about Montana not receiving meaningful access to education.[7] For example, following an ARD meeting in 2006, Mrs.

---

coverage . . . make it a less than ideal avenue for relief in harassment cases," but noting that "[i]f the environment renders the education inappropriate for an eligible child's needs, the district has violated IDEA"). Indeed, the United States as Amicus Curiae argues that the Lances' have sustained a § 504 claim premised on the School District's deliberate indifference but takes "no position as to whether Montana was deprived of FAPE."

[6] The Lances' complaint does allege that "the failure of the school district to develop an *Individualized Education Plan*, commensurate with his unique and individualized needs, rises to the level of a gross mismanagement of his educational plan and is also a violation of Section 504 thereby." But this is not an allegation that Montana's IEP was implemented *in violation of IDEA*, it simply is an argument that it was inadequate. Nevertheless, as discussed below, the summary judgment evidence demonstrates that Montana's IEP was developed in accordance with IDEA.

[7] As to placing Montana in DAEP, IDEA explicitly grants school districts discretion to make disciplinary decisions resulting in a change of placement "for not more than 10 school days." *See* 20 U.S.C. § 1415(k)(1)(A) ("School personnel may consider any unique circumstances on a case-by-case basis when determining whether to order a change in placement for a child with a disability who violates a code of student conduct."); 20 U.S.C.

No. 12-41139

Lance acknowledged that she reviewed the ARD minutes and signed that she "agree[d] with the decisions made." On January 10, 2007, September 18, 2007, and June 4, 2008, Mrs. Lance again signed that she agreed with the ARD's decisions regarding Montana's IEP. Further, on April 14, 2008, Mrs. Lance agreed to give permission for Montana to undergo a full psychological evaluation at the request of the ARD. Finally, on November 11, 2009, Mr. Lance attended Montana's last ARD meeting, which took place two months before his suicide. Mr. Lance agreed to the ARD's proposed plan. As the minutes reflect, the ARD "[r]eviewed proposed additional IEP goals and objectives" and "[p]arent agreed with goals as written." Accordingly, and consistent with statutory protection afforded a special-needs student's parents in formulating an IEP, the School District executed the IEP and BIP as the Lances agreed. *See, e.g.*, 20 U.S.C. § 1414(c)(3) ("Each local educational agency shall obtain informed parental consent . . . prior to conducting any reevaluation of a child with a disability"); 20 U.S.C. § 1415(a) ("parents are guaranteed procedural safeguards with respect to the provision for a free appropriate public education").

Second, the evidence of the ARD deliberations demonstrates that Montana was provided meaningful access to education consistent with IDEA and § 504. In 2008, the ARD reviewed Montana's progress and noted that Montana had "A's and B's in all classes." Further, Montana's classroom teacher reported that "Montana has made improvements in her class since the beginning of the year. He is doing very well academically, and does not require as much teacher attention. He still has emotional outbursts, but they have

---

§ 1415(k)(1)(B) ("School personnel under this subsection may remove a child with a disability who violates a code of student conduct from their current placement to an appropriate interim alternative educational setting . . . for not more than 10 school days (to the extent such alternatives are applied to children without disabilities).").

14

improved." Additionally, the classroom teacher reported that Montana "is very easily distracted and she has provided him with a seating arrangement to minimize distractions." The ARD also noted that Montana "has mastered his BIP goals." In 2009, the ARD met again and Mr. Lance attended. Again, Montana's teacher reported that "Montana has made progress" and is "doing well in class." The ARD minutes also recount that "[t]eachers have noted significant improvement in his behavior with the medication and support with the Behavior Intervention Plan. This is an improvement from last year."

The evidence establishes that the School District satisfied its § 504 FAPE obligations by implementing a valid IEP under IDEA. 34 C.F.R. § 104.33(b)(2). Montana's IEP "was developed through [IDEA's] procedures" and was "reasonably calculated to enable the child to receive educational benefits." *White*, 343 F.3d at 378 (quoting *Rowley*, 458 U.S. at 206–07). Accordingly, and because "to establish a claim for disability discrimination, in th[e] education context, something more than a mere failure to provide the 'free appropriate education' required by [IDEA] must be shown," *D.A.*, 629 F.3d at 454, summary judgment was appropriate on the Lances' failure-to-provide claim.

**3.**

The Lances' second § 504 claim is that the School District discriminated against Montana because it was deliberately indifferent to the disability-based harassment that he suffered at the hands of his classmates. This claim derives from *Davis v. Monroe County Board of Education*—a Title IX case. 526 U.S. 629 (1999). *Davis* held that school districts may be liable for failing to address student-on-student sexual harassment "only where they are deliberately indifferent to . . . harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650. Circuit courts have extended *Davis*'s reasoning to

claims for student-on-student harassment under Title VI. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664–65 (2d Cir. 2012); *Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 & n.5 (3d Cir. 2001) (Alito, J.) ("Although both *Franklin* and *Davis* dealt with sexual harassment under Title IX, we believe that their reasoning applies equally to harassment on the basis of the personal characteristics enumerated in Title VI and other relevant federal anti-discrimination statutes."); *see also Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998). Other circuits also have interpreted *Davis* to apply with equal force in the § 504 setting. *See, e.g., S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453–56 (6th Cir. 2008) (noting, however, that the parties agreed that *Davis*'s deliberate-indifference standard should apply, and explicitly reserving the right to "consider[] a different standard of review if and when the issue is presented to us in a future case of peer-on-peer harassment"); *Long v. Murray Cnty. Sch. Dist.*, 522 F. App'x 576, 577 & n.1 (11th Cir. 2013) (applying *Davis* to a peer-to-peer harassment case under § 504 when parties "effectively agree that the deliberate indifference standard" applies); *cf. S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 264 (3d Cir. 2013) (assessing the standard for intentional discrimination in a claim against a school district for misdiagnosing a student's disability but noting that "a showing of deliberate indifference may satisfy a claim for compensatory damages under § 504"); *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 650–51 (9th Cir. 2004) ("If a teacher is deliberately indifferent to teasing of a disabled child and the abuse is so severe that the child can derive no benefit from the services that he or she is offered by the school district, the child has been denied a FAPE.").

One reason courts have applied *Davis* by analogy to student-on-student harassment claims under § 504 is because § 504 is similarly worded to its

No. 12-41139

counterparts in Title II of the ADA, Title IX, and Title VI.[8] Additionally, § 504 and Title II incorporate Title VI's rights and remedies.[9] In this case, the Lances and the School District do not dispute that *Davis*'s test applies to § 504 claims.

In the § 504 setting, *Davis* requires a plaintiff to show:

> (1) he was an individual with a disability, (2) he was harassed based on his disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his education and created an abusive educational environment, (4) [defendant] knew about the harassment, and (5) [defendant] was deliberately indifferent to the harassment.

*S.S.*, 532 F.3d at 454; *see also Davis*, 526 U.S. at 650. The parties agree that Montana is an individual with a disability, but dispute the remaining four elements. The district court focused on the difficulty of the second element— that Montana was harassed based on his disability: "Nowhere in Plaintiffs' voluminous record is there *any* evidence that Montana was bullied or treated differently by school administration because of his disability." Because the Lances' evidence does not create an issue of fact as to the School District's deliberate indifference, however, we address this final element.

**4.**

The final element of the *Davis* test is consequential. This element requires that the Lances provide evidence that the School District was deliberately indifferent to known acts of harassment and thus liable for

---

[8] Title II of the ADA provides, in pertinent part, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title IX provides, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

[9] *See* 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 12133.

disability-based discrimination. *Davis*, 526 U.S. at 642–43. The Supreme Court has limited the deliberate-indifference standard: "We stress that our conclusion here—that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment—does not mean that recipients can avoid liability *only by purging their schools of actionable peer harassment* or that administrators must engage in particular disciplinary action." *Id.* at 648 (emphasis added). Section 504 does not require that schools eradicate each instance of bullying from their hallways to avoid liability. Judges make poor vice principals,[10] and as *Davis* instructs:

> courts should refrain from second-guessing the disciplinary decisions made by school administrators . . . [s]chool administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.

*Id.* As such, the deliberate-indifference inquiry does not "transform every school disciplinary decision into a jury question." *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999). Instead, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Though it granted summary judgment in favor of the School District, the district court observed: "If Plaintiffs'—often uncontested—facts are to be believed, the Defendants' approach to what seems to be fairly wide-spread bullying based on Plaintiffs' summary judgment evidence is to bury their collective heads in the sand. When faced with a fork in the road, the District's

---

[10] *See generally* Dennis Jacobs, *The Secret Life of Judges*, 75 Fordham L. Rev. 2855, 2861 (2007) ("Judges need a heightened respect for how nonlawyers solve problems, reach compromises, broker risks, and govern themselves and their institutions.").

choice seems to consistently be the path of inaction." Despite this broad negative characterization, the summary-judgment evidence as to bullying incidents involving Montana demonstrates that the School District responded in a manner that precludes a jury finding of deliberate indifference.

*First*, the evidence demonstrates that in two documented altercations involving Montana the School District both investigated the incidents and punished all of the students involved. *See Doe v. Bellefonte Area Sch. Dist.*, 106 F. App'x 798, 800 (3d Cir. 2004) ("The relevant inquiry for purposes of evaluating whether the School District here was deliberately indifferent to known circumstances of harassment is to review its response to reported incidents of harassment.").

After the November 4, 2009 incident, in which Montana was provoked and got in a shoving match with the other student, Vice Principal Amy Teddy testified that she investigated the incident and "actually talked with the kids a lot." Teddy further testified that she was "working on rebuilding [the quarreling students'] relationship with each other. . . . [And] . . . was working with them . . . so they could form a friendship." Further, the student who fought with Montana that day "got a consequence as well"—specifically the other student got an in-school suspension. Teddy then contacted both students' parents and "checked back with [the students] days later to see how they were doing and getting along."

After the December 18, 2009 incident when Montana pulled out his pocketknife, Teddy testified that she (1) "interviewed all of the students involved and documented their explanations of the events," (2) "met individually with all of the other students involved in the incident and asked them whether they felt threatened when Montana took out the knife," and (3) "contacted Mr. Lance and [the other students'] parents and met with them in person that day, along with notifying all the parents and students involved."

## No. 12-41139

Further, "[e]very child involved in th[e] incident received consequences," and "[e]very child with inappropriate behaviors received a suspension . . . of up to three days." The uncontested evidence also establishes that the other student involved in the altercation "had not previously had conflicts with Montana at school, nor had he had any previous disciplinary referrals during that year."

*Second*, and in response to allegations that Montana was bullied beyond the two documented instances,[11] there also is affirmative evidence of the School District's pattern of responding to other incidents involving Montana and promoting his relationship with other students. For example, a teacher reported that "there is a student in the class that [Montana] does not get along with and that the other student will intentionally upset Montana." The school psychologist summarized that there was a "classroom observation of Montana" and instructed that Montana's teacher "may want to seek guidance from the general education counselor as well as document his behaviors and mood" if the teacher has "any concerns regarding his behavior or mood." *See, e.g., S.S.*, 532 F.3d at 455 (school district did not respond indifferently when it took affirmative steps such as "monitoring" harassed student).

Teddy also recounted other incidents involving Montana. On November 2, 2009, when Montana was sent to the office "for having pushed another student at the end of gym class," Teddy "met with Montana about the incident and contacted his parents." On December 12, 2009, Montana was also referred to the office for "kicking three boys in the cafeteria line." The supervising teacher "removed Montana from the situation and gave him an opportunity to cool down." Teddy spoke "with Montana about the incident and with the

---

[11] For example, a parent of another child at Stewart's Creek testified that Montana "was bullied at Stewarts[sic] Creek from the first through the fourth grade," and that "[t]he bullying worsened each year." Montana's classmate also testified that they saw students bully Montana, that he was bullied "more than once a day," and that the bullying got worse as Montana got older.

supervising teacher involved," but did not give a consequence because "[g]enerally when a child regains his composure after an outburst I prefer to return the child to class so he does not miss his academic learning." Teddy also intervened when Montana was having a tough time at recess. Teddy testified that she "worked with Montana because he had been getting in trouble at recess" by giving him "special access to some basketballs" and teaching him to play the game "horse."

Kerry Woods, a teacher at Stewart's Creek, also testified about her responses to altercations involving Montana. When Woods "observed that Montana had a great deal of difficulty getting along with another special education student," Woods "enforced their separation," by "not allow[ing] them to sit or stand near one another or be in small groups together." As one student testified, when Montana was physically bullied and he told the teacher, the teacher would "[t]ell the one person that hit [Montana] that he was going to get in big trouble."[12]

*Third*, the Lances' expert acknowledges that the School District's anti-bullying policies are "appropriate and up to national standards." Equally, the Lances' expert acknowledges that the School District provided an employee training presentation, entitled "Bullying and Harassment in Schools." *See Doe*, 106 F. App'x at 800 ("The School District also held assemblies and enacted policies addressing peer-to-peer harassment. Such actions are not clearly

---

[12] Mr. Lance's testimony that Montana would complain about bullying to his teacher and that the teacher would call him a "tattletale" is insufficient to sustain a deliberate-indifference claim in light of the School District's demonstrated responsiveness to the aforementioned two documented incidents of bullying. See *Werth v. Bd. of Dirs. of Pub. Schs. of City of Milwaukee*, 472 F. Supp. 2d 1113 (E.D. Wisc. 2007) (holding summary judgment appropriate on deliberate-indifference when teacher failed to respond to student's complaints of physical harassment and recognizing, "[p]erhaps Kruzel could have handled the situation better by talking with the students after the first incident, but no reasonable jury could find that Kruzel's failure to write Larry W. up immediately rather than after the second time he threw wood blocks was 'clearly unreasonable'").

unreasonable.").[13] One student also testified that a counselor at the school, Mr. Glass, spoke to the students about bullying following Montana's death and told the students to stop bullying other students. That student testified also that Mr. Glass had told the students to stop bullying before Montana's death.

Under our caselaw, the School District's response was not clearly unreasonable. *See, e.g.*, *Sanches*, 647 F.3d at 168 (granting summary judgment on deliberate indifference and noting that the "[i]neffective responses, however, are not necessarily clearly unreasonable" and that the "district's responses here were not clearly unreasonable merely because the actions continued"); *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 388 (5th Cir. 2000) (holding that principal's investigation not a clearly unreasonable response to sexual abuse allegation because "we cannot say . . . that these actions, though ineffective in preventing McGrew from sexually abusing students, were an inadequate response to J.H.'s allegation").

Other circuits apply *Davis* similarly. *See Long*, 522 F. App'x at 577–78 (affirming grant of summary judgment because "the evidence shows a pattern on the part of Defendants of responding promptly to reported incidents, and we agree that Plaintiffs have failed to adduce evidence that would permit a jury to reasonably find that Defendants' disciplinary responses to the reported harassment incidents were clearly unreasonabl[e]" (quotations omitted) (alteration in original)); *S.S.*, 532 F.3d at 455 (holding that "[t]he record in this

---

[13] The expert also opined that the School District's "custom and practice was to completely ignore or fail to adequately investigate, document, and report incidents of bullying or alleged bullying." This custom and practice, the expert continued, "reflect[ed] deliberate indifference to [Montana's] safety." The district court excluded Dr. Poland's testimony to the extent it embraced an ultimate legal conclusion and found that his use of the term "deliberate indifference . . . invaded the provinces of the jury." Further, our court has noted that a school district's "'failure to comply with [its] regulations . . . does not establish the requisite . . . deliberate indifference.'" *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–92 (1998)).

case does not give rise to an inference that Model was deliberately indifferent to S.S.'s situation or that it had an attitude of permissiveness that amounted to discrimination" because the School "took the affirmative steps described above to address the incidents of harassment involving S.S. . . . specifically, meeting with the students, communicating with parents, and disciplining the offending students"); *Doe*, 106 F. App'x at 800 (summary judgment appropriate for school district when "[e]ach and every time Doe complained, the School District responded with reasonable actions which eliminated further harassment between Doe and the student(s) involved in each incident . . . [s]tudents were suspended and others were given warnings and counseled regarding the seriousness of harassment"); *cf. Mathis v. Wayne Cnty Bd. of Educ.*, 496 F. App'x 513, 516 (6th Cir. 2012) (affirming denial of judgment as a matter of law when "the testimony at trial suggested that WBOE took little to no immediate action to protect James from the two forms of harassment he endured . . . [t]hey[sic] jury was aware that WBOE did not conduct *any* substantive investigation of either incident, nor did it promptly punish the behavior" (emphasis added)).

As was true in *Sanches*, the School District's actions "stand in sharp contrast to those in other cases in which school officials were deliberately indifferent." 647 F.3d at 168. In *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 448–49 (6th Cir. 2009), for instance, the school district responded to harassment "largely by giving verbal reprimands to the perpetrators," the harassment escalated, and the school district's "only response was to employ the same type of verbal reprimands that it had used unsuccessfully."[14] In

---

[14] *Patterson* also states that "We believe . . . that, even though a school district takes some action in response to known harassment, if further harassment continues, a jury is not precluded by law from finding that the school district's response is clearly unreasonable." *Id.* at 448. This interpretation of *Davis* is in tension with our recognition in *Sanches* that "[i]neffective responses, however, are not necessarily clearly unreasonable." *Sanches*, 647

No. 12-41139

*Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000), moreover, the court held that a jury could find deliberate indifference when:

> On one occasion, a student's harassing conduct culminated in stabbing Alma in the hand. With the exception of talking to the student, there was no evidence before the jury or this Court that Spencer took any other action whatsoever. On another occasion, two male students held Alma while another took off his pants and others pulled her hair and attempted to rip off her clothes. With respect to that incident, the only evidence before the jury evincing Spencer's response is that a class room teacher spoke to the boys and Alma. There is no evidence before this Court that Spencer ever disciplined the offending students nor informed law enforcement as a result of any of these incidents. On yet another occasion, Alma's mother filed a detailed complaint with Spencer's Title IX coordinator. An investigation, however, never resulted.

As Amy Teddy's testimony demonstrates, the School District's response to documented instances involving Montana exceeded those of the school districts in *Patterson* and *Vance*.

In sum, under *Davis*, and specifically our application of its deliberate indifference standard, school districts are afforded flexibility in responding to unacceptable behavior and may tailor their responses to the circumstances. As the Supreme Court has instructed: "We thus disagree with respondents' contention that, if Title IX provides a cause of action for student-on-student harassment, 'nothing short of expulsion of every student accused of misconduct involving sexual overtones would protect school systems from liability or damages.'" *Davis*, 526 U.S. at 648. If, however, a school district consciously

---

F.3d at 168. Further, the dissenting judge in *Patterson* recognized a disharmony within the Sixth Circuit on this point and highlighted that "a school acts appropriately if it investigates what has already occurred, reasonably tries to end any harassment still ongoing by the offenders, and seeks to prevent the offenders from engaging in such conduct again." *Patterson*, 551 F.3d at 458–60 (Vinson, J., dissenting); *see also id.* at 460 (Vinson, J., dissenting) ("To suggest otherwise . . . comes extremely close to requiring that schools be 'purged' of all offensive behavior and be completely harassment-free, which the Supreme Court and Sixth Circuit have unequivocally held is not required—or possible.").

avoids confronting harassment or responds to harassment in another clearly unreasonable manner, which courts have equated with pretextual or knowingly ineffective interventions, then it may be found to have discriminated against the harassed student. Because the record evidences a pattern of active responses by the School District to incidents involving Montana, no such discriminatory intent against Montana and his disability may be imputed to the School District. Summary judgment is appropriate on this claim as well, therefore.

## II.

The Lances asserted three theories of §1983 liability in the district court: (1) a "special relationship" theory, (2) a "state-created danger" theory, and (3) a "caused-to-be subjected" theory. On appeal, and in light of *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849 (5th Cir. 2012) (en banc), the Lances have not briefed their "special-relationship theory." Instead, they argue only that they created an issue of fact under the "caused-to-be subjected" theory and "state-created danger" theory. The Lances' two theories have never been adopted in this circuit, and, in any event, the "state-created danger" theory fails on its own terms.[15]

## A.

The *en banc* court in *Covington* held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," unless the "very limited" special-relationship exception applies. *Covington*, 675 F.3d at 855–56 (quoting *DeShaney v. Winnebago Cnty.*

---

[15] The Lances' state-created danger claim was apparently dismissed at the 12(b)(6) stage. But, the district court again reiterated the invalidity of the state-created danger theory in its order adopting the magistrate judge's recommendation to grant summary judgment on the other § 1983 claims. The School District, however, does not argue that we should review the state-created danger claim under the Rule 12(b)(6) standard, but instead acknowledges that we are reviewing all of the § 1983 claims under the summary-judgment standard.

*Dep't of Social Servs.*, 489 U.S. 189, 197 (1989)). Importantly, the *en banc* court held that "a public school does not have a *DeShaney* special relationship with its students requiring the school to ensure the students' safety from private actors." *Id.* at 857. Nevertheless, the Lances argue that they have created an issue of fact under the text of § 1983.[16] *See Covington*, 675 F.3d at 871 (Higginson, J., concurring) ("Set against this statutory language . . . [i]f the complaint had asserted that the affirmative act of releasing Jane to Keyes was a causal act of recklessness or deliberate indifference or intentionality that caused her to be subjected to injury, and specifically to the deprivation of her right to bodily integrity, the complaint properly would proceed through discovery to trial."). But under our court's holding in *Covington*, to succeed under § 1983 there must be a special relationship between the defendant and the victim. *Id.* at 855–56. As in *Covington*, no special relationship exists in this case. *Id.* at 857. Accordingly, the Lances cannot make a constitutional claim based on student-to-student harassment or Montana's own suicide.

**B.**

The *en banc* court in *Covington* also recognized that "we have never explicitly adopted the state-created danger theory," and "decline[d] to use th[e] *en banc* opportunity to adopt the state-created danger theory in this case because the allegations would not support such a theory." 675 F.3d at 864, 865.

---

[16] Section 1983 provides:

> Every person who, under color of [law] ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

A viable claim under §1983 alleges (1) "a violation of a right secured by the Constitution or laws of the United States," and (2) "that the alleged deprivation was committed by a person acting under color of state law." *Covington*, 675 F.3d at 854 (citations and internal quotations omitted).

No. 12-41139

Nevertheless, the *en banc* court applied the state-created danger framework to plaintiffs' claim and concluded that plaintiffs' "allegations do not support a claim under the state-created danger theory, even if that theory were viable in this circuit." *Id.* at 866.  In light of *Covington*'s express decision not to recognize the state-created danger theory our court has repeatedly noted its unavailability, *see, e.g.*, *Whitley v. Hanna*, 726 F.3d 631, 639 n.5 (5th Cir. 2013) ("[T]his court has not adopted the state-created danger theory, . . . and Whitley wisely has disclaimed reliance on it."); *Colomo v. San Angelo Indep. Sch. Dist.*, 501 F. App'x 314 (5th Cir. 2012), or recognized that it is not viable but dismissed the claim assuming its validity. *See Guardiola v. Thaler*, 529 F. App'x 406 (5th Cir. June 18, 2013); *Dixon v. Alcorn Cnty. Sch. Dist.*, 499 F. App'x 364, 366–67 (5th Cir. 2012).

Taking the view most favorable to the Lances—assuming that state-created danger is a viable theory—the evidence does not create a genuine issue of material fact. A state-created danger theory requires (1) "th[at] defendants used their authority to create a dangerous environment for the plaintiff" and (2) "that the defendants acted with deliberate indifference to the plight of the plaintiff." *Covington*, 675 F.3d at 865 (quoting *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 537–38 (5th Cir. 2003)).

> The second element is then subdivided into three prongs, which combine to subsume the first original element," specifically, a plaintiff would have to show that "(1) the environment created by the state actor is dangerous, (2) the state actor must know it is dangerous (deliberate indifference), and (3) the state actor must have used its authority to create an opportunity that would not otherwise have existed for the third party's crime to occur."

*Dixon*, 499 F. App'x at 366–67 & n.3.; *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2001).

The Lances point to two invasions of Montana's bodily integrity by private actors: (1) bullying by his peers and (2) his own suicide. The Lances'

state-created danger theory as applied to the bullying fails because the School District did not "create[] an opportunity that would not otherwise have existed," *Johnson v. Dall. Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994), or take any action that made Montana more likely to be bullied. *See Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 250 (5th Cir. 2003) (rejecting state-created danger claim because that the school board was not "assiduous at fighting gang activity . . . does [not] show that the Board affirmatively placed Avila in a position of danger, namely in the situation where Balderas was a greater threat to him than he would have been otherwise"). As discussed, the evidence shows that the School District attempted to alleviate tensions between Montana and other students, by, for instance, arranging his seating in class away from a problematic student. Accordingly, this claim fails. *See Johnson*, 38 F.3d at 201 ("The key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." (internal quotations and citations omitted)).

As to Montana's suicide, the Lances point to no evidence that the School District knew that Montana's suicide was immediate. Instead, all of the psychologists that met with Montana testified they did not think he would hurt himself. Riek met with Montana after he made his suicidal outburst at DAEP, and he testified that "after questioning him, observing his behavior, and talking with him about many topics over the course of more than one hour, I assessed the lethality of his statement as low." Riek also followed up with Montana and alerted Mr. Lance. Further, Riek testified, "I was convinced that Montana was not an imminent danger to himself or others." On January 18, 2010, days before his death, Montana met with a psychologist, Katie Besly. Besly testified that Montana "did not give any indication that he was intending

to end his life." Further, hours before his death, Montana met with Vice Principal Teddy, who testified that his "demeanor was cheerful" and that "[h]is death was a complete shock to me."

As in *Covington*, the evidence does not demonstrate that the "school knew about an immediate danger to [Montana's] safety." *Covington*, 675 F.3d at 866; *see also Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc) ("[T]he school district placed the student in the same area as a school custodian who had no known criminal record, sexual or otherwise, with school teachers in the same building but not in the immediate area. . . . Such post hoc attribution of known danger would turn inside out this limited exception to the principle of no duty.").

Further, the Lances cannot show that the School District created a dangerous environment for Montana. *See Sanford v. Stiles*, 456 F.3d 298, 311–12 (3d Cir. 2006) (holding that link between plaintiff's suicide and defendants' conduct was "far too attenuated to justify imposition of liability"). In *Henjy v. Grand Saline Indep. Sch. Dist.*, 420 F. App'x 473 (5th Cir. 2011), for example, a plaintiff sued the school district after her daughter, E.R., attempted suicide in a school restroom. No. 2-10-cv-50-TJW, 2010 WL 2521007, at *1 (E.D. Tex. June 17, 2010). In November 2007, E.R. wrote "a missive about acts of violence against others and herself," which was confiscated by a school official and brought to the principal's attention. *Id.* E.R. was arrested the day before her attempted suicide, and, upon bringing E.R. to school, Henjy told a secretary to contact her if "anything happened during the school day." *Id.* During class that day, E.R. made a suicide threat to her friend, who told the teacher, who in turn told the school counselor, Ms. Fisher. *Id.* Henjy alleged that Fisher, "with full awareness of the suicide threat, sent E.R. back to class." *Id.* E.R. requested to be excused from the class to use the restroom, and attempted suicide. *Id.* The district court declined to adopt a state-created danger theory, *id.* at *3, and our

No. 12-41139

court affirmed. *Henjy*, 420 F. App'x at 473. Henji's claim failed because there was nothing to suggest that the School District affirmatively increased the chance that she would commit suicide. For those same reasons, this case does not sustain a state-created danger claim, even assuming that theory's validity. Accordingly, summary judgment was appropriate on the Lances' § 1983 claims.

## CONCLUSION

Because the School District did not discriminate against Montana because of his disability nor deprive Montana of a constitutional right, we AFFIRM.