K.M. a minor, by and through her
Guardian Ad Litem, Lynn
BRIGHT, Plaintiff,

v.

TUSTIN UNIFIED SCHOOL
DISTRICT, Defendant.

Case No. SA CV 10–1011–DOC (MLGx).

United States District Court,
C.D. California,
Southern Division.

Signed June 1, 2015.

---

David M. Grey, Grey and Grey, Santa Monica, CA, for Plaintiff.

Jack Byron Clarke, Jr., Best Best and Krieger, Riverside, CA, Cary Kit Quan, Declues Burkett & Thompson LLP, Huntington Beach, CA, for Defendant.

## ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR ATTORNEY'S FEES [95]

DAVID O. CARTER, District Judge.

Before the Court is Plaintiff K.M.'s Motion for Attorney's Fees. Oral arguments were heard on May 26, 2015. Having reviewed the papers and supporting exhibits, and considered the oral arguments, the Court rules as follows: the Motion is GRANTED IN PART. The Court finds that a fee award of 50% of the lodestar for work done during the underlying administrative proceeding, 75% of the lodestar for work done at the district court through summary judgment, and 100% of the lodestar for work done on appeal and subsequently is appropriate given the limited success in this matter, as K.M. prevailed solely on her American with Disabilities Act and California Unruh Act claims, but not her claims for a Free and Appropriate Education ("FAPE") under the Individual with Disabilities Education Act ("IDEA").

### I. BACKGROUND

### A. Underlying Factual and Procedural Background

The factual background is drawn from the Ninth Circuit's Order in *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.* (*"Bright"*), 725 F.3d 1088, 1092–94 (9th Cir.2013) *cert. denied,* —— U.S. ——, 134 S.Ct. 1493, 188 L.Ed.2d 376 (2014) and *cert. denied sub nom. Poway Unified Sch. Dist. v. D.H. ex rel. K.H.,* —— U.S. ——, 134 S.Ct. 1494, —— L.Ed.2d —— (2014).

At the time relevant in this case, K.M. was a student in the Tustin Unified School District. Because of her hearing loss, K.M. was eligible for special education services under the IDEA. Her eligibility meant that Tustin was required to provide K.M. with a "free appropriate public education" ("FAPE") suited to her individual needs. 20 U.S.C. § 1412(a)(1). As required by the statute, Tustin convened

regular meetings to develop an annual "individualized education plan" ("IEP") identifying K.M.'s educational goals and laying out which special services Tustin will provide to address those goals in the upcoming academic year. *See id.* § 1412(a)(4).

In spring 2009, when K.M. was completing the eighth grade, Tustin and her parents began to prepare for her upcoming transition to high school. At a June 2009 meeting of K.M.'s IEP team, K.M.'s mother requested that Tustin provide her with Communication Access Realtime Translation ("CART") beginning the first day of ninth grade, in Fall 2009. K.M.'s longtime auditory-visual therapist recommended that K.M. receive CART in high school. The IEP team deferred a decision on the CART request, instead developing an IEP that offered K.M. other accommodations.

Shortly thereafter, K.M. filed an administrative complaint challenging the June 2009 IEP. During the course of K.M.'s ninth grade year, her parents and Tustin officials met for several IEP meetings but were unable to come to an agreement that would resolve the complaint. After providing K.M. with trials of both CART and an alternative transcription technology called TypeWell, her IEP team concluded that she did not require transcription services to receive a FAPE under the IDEA, *see* 20 U.S.C. § 1412(a)(1), and reaffirmed the June 2009 IEP.

K.M.'s challenge to the June 2009 IEP proceeded to a seven-day hearing before a California administrative law judge ("ALJ"). K.M. testified that she could usually hear her teachers but had trouble hearing her classmates and classroom videos. Several of K.M.'s teachers testified that, in their opinion, K.M. could hear and follow classroom discussion well.

Applying the relevant legal standards, the ALJ concluded that Tustin had com-

plied with both its procedural and substantive obligations under the IDEA and had provided K.M. with a FAPE. The ALJ observed that K.M.'s mother was requesting CART so that K.M. could "maximize her potential," but the IDEA, as interpreted by the U.S. Supreme Court in *Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), does not require schools to provide "a potential-maximizing education."

Dissatisfied, K.M. filed a complaint in this Court challenging the ALJ decision on her IDEA claim. She also asserted disability discrimination claims under Section 504 of the Rehabilitation Act, Title II of the ADA, and California's Unruh Civil Rights Act. With respect to her ADA claim, she sought, in addition to other relief, "an Order compelling Defendants to provide CART." The complaint alleges that CART "is commonly paid for by other Southern California public school districts," including the Los Angeles Unified School District and the Santa Monica Malibu School District, and "is also commonly provided at the college level under the ADA."

In declarations submitted to the Court, K.M.'s teachers declared that she participated in classroom discussions comparably to other students. K.M. saw her situation quite differently, emphasizing that she could only follow along in the classroom with intense concentration, leaving her exhausted at the end of each day.

This Court granted summary judgment for Tustin. First, as to K.M.'s IDEA claim, the Court stated that it was "reluctant to adopt fully teacher and administrator conclusions about K.M.'s comprehension levels over the testimony of K.M. herself," and found "that K.M.'s testimony reveals that her difficulty following discussions may have been greater than her

teachers perceived." Nevertheless, the Court agreed with the ALJ that, under the relevant legal standards, K.M. had been afforded a FAPE compliant with the IDEA. Second, the Court held that "K.M.'s claims under the ADA and the Rehabilitation Act fail on the merits for the same reason that her claim under [the] IDEA failed." Finally, the Court noted that Unruh Act liability requires intentional discrimination or an ADA violation, neither of which K.M. had shown.

K.M. appealed, challenging only this Court's rulings on her ADA and Unruh Act claims.

## B. The Ninth Circuit's Ruling

On appeal, K.M. maintained that Title II of the ADA imposes effective communication obligations upon public schools independent of, not coextensive with, schools' obligations under the IDEA.

In a published decision, the Ninth Circuit agreed. It held that, on question of first impression, a school district's compliance with its obligations to a deaf or hard-of-hearing child under IDEA did not necessarily establish compliance with its effective communication obligations to that child under Title II of the ADA. *See generally Bright,* 725 F.3d 1088.

In the opinion, the Ninth Circuit laid out the statutory and regulatory background for the IDEA and Title II of the ADA. It noted, IDEA requires schools to "make available to children with disabilities a FAPE, tailored to their individual needs." *Id.* at 1095 (citing 20 U.S.C. § 1400(d)(1)(A)). To receive federal funds under the IDEA, schools must show how they have implemented "policies and procedures" to provide disabled children with a FAPE, including procedures to develop an IEP for each eligible child. *Id.* (citing 20 U.S.C. § 1412(a), (a)(1), (a)(4)).

The Ninth Circuit distinguished the process-oriented IDEA from the ADA, noting that, while "the ADA imposes less elaborate procedural requirements," it also "establishes different substantive requirements that public entities must meet." *Id.* at 1096.

The Ninth Circuit then turned the Court's reasoning in dismissing the ADA claim:

> In the district court's analysis in *K.M.* [ ] the plaintiffs' ADA claims were tethered to their IDEA claims through the connective thread of a third federal statute, Section 504 of the Rehabilitation Act. Section 504 bars the exclusion of individuals with disabilities from any program or activity receiving federal funds. *See* 29 U.S.C. § 794(a). The district court in *K.M.* reasoned that "the fact that K.M. has failed to show a deprivation of a FAPE under IDEA . . . dooms her claim under Section 504, and, *accordingly,* her ADA claim" (emphasis added). The district court [ ] arrived at this reasoning by combining two lines of our case law. In the first line of cases, we have identified a partial overlap between the statutory FAPE provision under the IDEA and a similar provision within the Section 504 regulations promulgated by the Department of Education, requiring schools receiving federal funds to provide "a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction." 34 C.F.R. § 104.33(a). Although both the IDEA and the Section 504 regulation use the locution "free appropriate public education," [ ] we have concluded that the two FAPE requirements are "overlapping but different." *See Mark H.* [*v. Lemahieu*], 513 F.3d [922] at 925, 933 [ (9th Cir.2008) ]. At the same time, we have noted that, as provided by the Section 504 FAPE regulation, "adopting a valid IDEA IEP is sufficient but not necessary to satisfy the [Section] 504 FAPE requirements." *Id.* at 933 (citing 34 C.F.R. § 104.33(b)(2)); *see also A.M. v. Monrovia Unified Sch. Dist.,* 627 F.3d 773, 782 (9th Cir.2010).

> In the second line of cases, we have discussed the close relationship between Section 504 and Title II of the ADA. Congress used the earlier-enacted Section 504 as a model when drafting Title II. *See Duvall v. Cnty. of Kitsap,* 260 F.3d 1124, 1135 (9th Cir.2001). We have observed on occasion that "there is no significant difference in the analysis of rights and obligations created by the two Acts." *Vinson v. Thomas,* 288 F.3d 1145, 1152 n. 7 (9th Cir.2002).

> Combining these two lines of cases, the district courts reasoned that (1) a valid IDEA IEP satisfies the Section 504 FAPE regulation; (2) Section 504 and Title II are substantially similar statutes; (3) therefore, a valid IDEA IEP also satisfies Title II. This syllogism overstates the connections both between the IDEA and Section 504, and between Section 504 and Title II.

*Id.* at 1098.

In rejecting the "syllogism," the Ninth Circuit made two key points. First, that a school district's compliance with the IDEA does not doom all of a student's Section 504 claims. *Id.* at 1098. "Because a school district's provision of a FAPE under the IDEA meets Section 504 FAPE requirements, a claim predicated on finding a violation of the Section 504 FAPE standard will fail if the IDEA FAPE requirement has been met. Section 504 claims predicated on other theories of liability under that statute and its implementing regulations, however, are not precluded by a determination that the student has been provided an IDEA FAPE." *Id.* Second, it emphasized the "nuanced" connection between Title II and Section 504, identifying key differences in the standards applied

under the two regimes. *Id.* The Ninth Circuit found K.M.'s liability theory was not premised on FAPE at all, "indeed, Title II does not impose any FAPE requirement." *Id.* at 1099. Rather, K.M. grounded her claim in the Title II effective communications regulation, "which they argue establishes independent obligations on the part of public schools to students who are deaf or hard-of-hearing." *Id.* The Ninth Circuit found that, "[i]nsofar as the Title II effective communications regulation has a Section 504 analog, it is not the Section 504 FAPE regulation[ ]. Rather, it is the Section 504 communications regulation at 28 C.F.R. § 39.160, as that is the regulation with which Congress has specified that Title II communications regulations must be consistent." *Id.* at 1099–1100 (citing 42 U.S.C. § 12134(b)).

After concluding that compliance with Section 504 FAPE regulations did not doom a Title II claim, the Ninth Circuit turned to a comparison between the IDEA and ADA communications provisions. It unraveled a tripartite distinction between the relevant portions of the IDEA and ADA, noting: (1) the factors that the public entity must consider in deciding what accommodations to provide deaf or hard-of-hearing children are different; (2) Title II provides the public entity with defenses unavailable under the IDEA; and (3) the Title II effective communications regulation, as relevant here, requires public schools to communicate "as effective[ly]" with disabled students as with other students, and to provide disabled students the "auxiliary aids ... necessary to afford ... an *equal opportunity* to participate in, and enjoy the benefits of" the school program, while that requirement is not relevant to IDEA claims, as the IDEA does not require schools to "provide 'equal' educational opportunities" to all students. *Id.* at 1100–01 (citations omitted). Therefore, the Ninth Circuit could not clarify precisely how the two statutes would "interact in particular cases." *Id.* at 1101. District courts must now evaluate "claims under the IDEA and Title II[ ]separately under the relevant statutory and regulatory framework." *Id.*

Finding that K.M. could, theoretically, maintain an action under Title II of the ADA despite the school district's compliance with its FAPE requirements, the Ninth Circuit reversed the judgment of this Court and remanded the action for further proceedings. In so doing, the Ninth Circuit· declined to consider alternate legal or factual grounds on which to affirm summary judgment. *Id.* at 1102. In declining to hear those alternate theories, the Ninth Circuit noted "[the] district court [did not] considered whether there was a genuine issue of material fact as to the school districts' compliance with Title II. Moreover, the school districts have litigated these cases thus far from the position that the plaintiffs' IDEA and Title II claims were coextensive. Now that we have clarified that the school districts' position is not correct, we expect that the parties may wish to further develop the factual record and, if necessary, revise their legal positions to address the specifics of a Title II as opposed to an IDEA claim." *Id.* at 1103.

## C. Subsequent Proceedings

Defendant petitioned for a writ of certiorari with the Supreme Court, which was denied on March 3, 2014. Reply Ex. A ("Petition"); *Tustin Unified Sch. Dist. v. K.M. ex rel. Bright,* — U.S. ——, 134 S.Ct. 1493, 188 L.Ed.2d 376 (2014).

On December 17, 2014, prior to the commencement of further substantive proceedings, the parties informed this Court that they had reached a settlement agreement. Notice of Settlement (Dkt. 91). Subsequently, the Court entered a Consent Decree for Judgment and Judgment on January 23, 2015. Judgment was entered in

favor of Plaintiff and against Defendant in the amount of $197,500. Consent Decree (Dkt. 94)

The Court retained jurisdiction to determine the amount of costs and attorney's fees, if any, owed to Plaintiff. *Id.*

On April 10, 2015, Plaintiff filed the present motion for attorney's fees (Dkt. 95). Plaintiff seeks recovery of $443,080 in attorney's fees and $15,282 in costs, with a 2.0 multiplier. Defendant objects, raising two major disputes: (1) K.M. is not entitled to an award of attorney's fees for her unsuccessful IDEA claim, specifically fees incurred during the administrative proceeding; and (2) that K.M.'s counsel fails to justify the fees that he demands.

## II. LEGAL STANDARD

■ Pursuant to 42 U.S.C. § 12205, a federal court may award reasonable attorneys' fees to the prevailing party in an action under the ADA. A prevailing party under the ADA "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Barrios v. California Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Under federal law, a "prevailing party" is one that effects "a material alteration of the legal relationship between the parties [whereby] the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant." *Farrar v. Hobby*, 506 U.S. 103, 113, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

■ The California Unruh Civil Rights Act ("Unruh Act") incorporates ADA standards such that "[a] violation of the ADA also constitutes a violation [of] the Unruh Act [ ]." *Californians for Disability Rights v. Mervyn's LLC*, 165 Cal.App.4th 571, 586, 81 Cal.Rptr.3d 144 (2008) (citing Cal. Civ.Code §§ 51(f), 54(c)). "Because the Unruh Act is coextensive with the ADA

and [unlike the ADA] allows for monetary damages, litigants in federal court in California often pair state Unruh Act claims with federal ADA claims." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007). Violators of the Unruh Act are liable for "attorney's fees that may be determined by the court." Cal. Civ.Code § 52(a).

■ A reasonable fee is that which is "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010). To calculate a reasonable fee under these statutes, courts apply the "lodestar" method, which is obtained by multiplying the number of hours reasonably expended on litigation by a reasonable hourly rate. *Charlebois v. Angels Baseball LP*, 993 F.Supp.2d 1109, 1115 (C.D.Cal.2012). Under the lodestar method, plaintiffs' attorneys should be compensated for "all hours reasonably spent" on the litigation. *Serrano v. Unruh*, 32 Cal.3d 621, 624, 186 Cal.Rptr. 754, 652 P.2d 985 (1982).

## III. ANALYSIS
### A. Prevailing Party

There is no dispute that, under the terms of the Consent Decree, the Plaintiff was the prevailing party as to Plaintiff's ADA and Unruh Act claims. Opp'n at 11 ("Tustin does not dispute that K.M. changed the legal relationship between the parties on her ADA claim by virtue of negotiating a consent decree through settlement negotiation."). Similarly, there is no dispute that Plaintiff did not prevail on her IDEA claim. Nonetheless, Plaintiff posits that because the IDEA and ADA claims were closely intertwined, and litigating the IDEA claim at all levels was necessary for the development and success on her ADA claim, all attorney's fees for

litigating this entire action including time spent on the IDEA claim should be available to her.

## B. IDEA Administrative Proceeding

Before proceeding to the lodestar calculation, the Court must first address a threshold issue of whether the Plaintiff is entitled to fees for hours worked in the underlying IDEA administrative proceeding, which was a prerequisite for bringing the successful ADA claim.

The issue presented is: where an IDEA claim must be exhausted in an administrative proceeding in order to bring an independent but related ADA claim in federal court, and a party is successful as to the second claim, but not as to the first, may the prevailing party on the ADA claim recover fees for the underlying administrative proceeding?

### 1. Fees for Unsuccessful Claims

■ *Hensley* established the framework for considering multiple claims in a single lawsuit, with mixed success. 461 U.S. at 432, 103 S.Ct. 1933. It held:

Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. *See Davis v. County of Los Angeles*, 8 E.P.D. ¶ 9444, at 5049 (C.D.Cal.1974). Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters. If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litiga-

tion as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.

*Id.* at 435–36, 103 S.Ct. 1933.

In *Cabrales v. Cnty. of Los Angeles*, 935 F.2d 1050 (9th Cir.1991), the Ninth Circuit considered whether a prevailing plaintiff in a civil rights lawsuit could recover "attorney's fees in connection with [an] unsuccessful opposition to [a] petition for certiorari," where the plaintiff was ultimately successful as to her suit overall. *Id.* at 1052. The court held that she could. It presented the applicable law as follows:

We read *Hensley* as establishing the general rule that plaintiffs are to be compensated for attorney's fees incurred for services that contribute to the ultimate victory in the lawsuit. Thus, even if a specific claim fails, the time spent on that claim may be compensable, in full or in part, if it contributes to the success of other claims.

*Id.* However, in a footnote that is meaningful in this context, the Ninth Circuit expressed, "[o]f course, had [Plaintiff] filed the petition for certiorari requesting additional relief, she would not be entitled to attorney's fees unless she ultimately prevailed on the issue raised by that petition." *Id.* at 1052 n. 1 (citing *Toussaint v. McCarthy, II*, 826 F.2d 901, 904 n. 3 (9th Cir.1987); *Akbar v. Fairman*, 788 F.2d 1273, 1279 (7th Cir.1986)).

Therefore, the Court must assess whether fees incurred pursuing the IDEA claim, and specifically, the related administrative

proceeding, may be awarded following Plaintiff's success on her ADA claim. The Court thus needs to establish whether the administrative proceeding was essentially "a stage" in the same litigation on which Plaintiff eventually prevailed. *Id.* at 1053. If so, the Court will turn to whether and how to modify fees upwards or down, based on Plaintiff's overall success in the litigation. *Hensley,* 461 U.S. at 436–37, 103 S.Ct. 1933.

### 2. Fee Awards for Administrative Proceedings

██ Federal and state law establish that fees may be awarded for administrative proceedings that are a prerequisite to filing a civil action in state or federal court.

In *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 56, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) the Supreme Court held that courts may allow the prevailing party attorney's fees for legal services performed in prosecuting an employment discrimination claim in state administrative and judicial proceedings that Title VII requires federal claimants to invoke. "An examination of the language and history of the statute, the nature of the proceedings in which respondent participated, and the relationship of those proceedings to Title VII's enforcement mechanisms, together persuade us that Congress clearly intended to authorize awards of attorney's fees to persons in respondent's situation." *Id.* at 61, 100 S.Ct. 2024. The Supreme Court found that "Title VII establishes a comprehensive enforcement scheme in which state agencies are given 'a limited opportunity to resolve problems of employment discrimination and thereby to make unnecessary resort to federal relief by victims of the discrimination.'" *Id.* at 63, 100 S.Ct. 2024 (citing *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 755, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979)).

Similarly, in *Edna Valley Watch v. Cnty. of San Luis Obispo,* 197 Cal.App.4th 1312,

1315, 129 Cal.Rptr.3d 249 (2011), *as modified on denial of reh'g* (Sept. 1, 2011), after considering the statutory objectives behind California Code of Civil Procedure § 1021.5, the private attorney general statute, the California court of appeal found that the statute allows attorney's fees in underlying administrative proceedings related to the lawsuit. In so deciding, the court considered whether the administrative proceedings, which were a prerequisite to the lawsuit challenging a California Environmental Quality Act determination, were sufficiently connected to the court action to trigger an award of fees. Finding "there can be no public interest litigation without first filing an administrative proceeding," it held the word "action" should be interpreted broadly within the meaning of § 1021.5, looking at the purpose of the section, to effectuate a strong public policy by awarding fees "to persons who through lawsuits successfully bring about the benefits of such policies to a broad class of citizens." *Id.* at 1320, 129 Cal.Rptr.3d 249. While § 1021.5 is not at issue here, this Court agrees with the court in *Edna Valley* that statutory language regarding attorney's fees must be read within the context of statutory purposes and facts of the case to effectuate the intention of the legislature in passing the statute.

### a. ADA Fee Shifting Provision

██ The purposes behind the fee shifting provision of the ADA are analogous to the purposes of California's private attorney general statute; the language is modeled on the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. As explained in the Reports supporting § 1988, civil rights statutes vindicate public policies "of the highest priority," [ ], yet "depend heavily upon private enforcement," [ ]. Persons who bring meritorious civil rights claims, in this light,

serve as "private attorneys general." [ ]. Such suitors, Congress recognized, often "cannot afford legal counsel." [ ]. They therefore experience "severe hardshi[p]" under the "American Rule." [ ]. Congress enacted § 1988 to ensure that no-naffluent plaintiffs would have "effective access" to the Nation's courts to enforce civil rights laws. [ ]. That objective accounts for the fee-shifting provisions before the Court in this case, prescriptions of the FHAA *and the ADA modeled on § 1988.* [ ].

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 635–36, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (citations omitted) (final emphasis added); *see also Blackwell v. Foley,* 724 F.Supp.2d 1068, 1076 (N.D.Cal. 2010) (discussing purposes of fee-shifting provision of the ADA). Therefore, the language of the ADA fee-shifting provision must be read in light of these underlying purposes of encouraging "private attorneys general" to bring suit to vindicate the rights of public.

Section 12205 of the ADA reads:

In *any action or administrative proceeding commenced pursuant to this* chapter, the court or agency, in its discretion, may allow the prevailing party[ ], a reasonable attorney's fee, including litigation expenses, and costs [ ].

42 U.S.C. § 12205.

The plain language itself does not exclude an award of fees for an administrative proceedings. Thus, the Court considers whether the IDEA administrative proceeding may be fairly considered "commenced pursuant to" the ADA, where the IDEA proceeding is a prerequisite to filing the ADA action in federal court. The Court answers this question keeping in mind the underlying purposes of the attorney's fees provision of the ADA and the statutory scheme of both statutes generally.

### b. Nature of the Administrative Exhaustion Requirement

To determine whether the administrative proceeding was "commenced pursuant" to the ADA, or, put another way, was essentially a part of the same litigation as the ADA claim, the Court considers IDEA's exhaustion requirement and whether it was part of the ADA's enforcement scheme. IDEA's exhaustion requirement is found in 20 U.S.C. § 1415($l$). This provision states:

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415($l$) (alterations in original).

The IDEA's exhaustion requirement fits into a broader educational disability rights framework. "The exhaustion requirement is intended to prevent courts from acting as ersatz school administrators and making what should be expert determinations about the best way to educate disabled students." *Payne v. Peninsula Sch. Dist.,* 653 F.3d 863, 876 (9th Cir.2011) *overruled on other grounds by Albino v. Baca,* 747 F.3d 1162 (9th Cir.2014). The exhaustion provision is designed to "allow[ ] for the exercise of discretion and educational expertise by state and local agencies, afford[ ] full exploration of technical edu-

cational issues, further[ ] development of a complete factual record, and promote[ ] judicial efficiency by giving ... agencies the first opportunity to correct shortcomings in their educational programs for disabled children." *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303 (9th Cir.1992).

As the Ninth Circuit has noted, "the exhaustion provision in § 1415(*l*) is framed as an exception to the general rule of construction that '[n]othing in [the IDEA] shall be construed to restrict' the rights, procedures, and remedies available under § 1983, the ADA, or the Rehabilitation Act. In other words, remedies available under the IDEA, by rule, are in addition to the remedies parents and students have under other laws." *Payne*, 653 F.3d at 872.

■ It is not disputed that it was necessary for K.M. to exhaust her administrative remedies because the relief that she sought, CART, is available under the IDEA. *See* 20 U.S.C. § 1415(*l*); *Payne*, 653 F.3d at 875 (a student must exhaust her IDEA remedies before seeking parallel relief under the ADA). Thus, while her IDEA claim was wholly unsuccessful, Plaintiff was obligated under the existing law to clear the administrative hurdle before she could be granted access to this Court to bring her remaining claims. This mandatory exhaustion of administrative remedies for ADA claimants seeking relief "also available under IDEA" means that the administrative actions are part of an overall scheme of rectifying students' rights to access to education, without unduly burdening school systems with additional litigation. This weighs strongly in favor of considering the administrative proceedings under the IDEA as an essential part of the ADA suit, such that the administrative proceeding could be considered "commenced pursuant" to the ADA for the purposes of § 12205.

The Court also notes that, were it to read the statute otherwise and find IDEA's administrative proceeding to be wholly distinct from the ADA proceeding, the IDEA statute would essentially be restricting the remedies available under the ADA, as a portion of the fees expended for a successful ADA claim (requiring an unsuccessful IDEA claim) would never be recoverable. This result would discourage ADA litigation, and would undermine the express purposes of the ADA and IDEA. Thus, the Court finds this result untenable.

### c. Relationship Between the ADA and IDEA

The Court next considers the relationship between the ADA and the IDEA, in assessing whether the IDEA administrative proceeding is essentially part of the ADA enforcement scheme for the purposes of awarding fees.

"The IDEA was enacted to protect children with disabilities and their parents by requiring participating states to provide 'a free appropriate public education ... that emphasizes special education and related services designed to meet [disabled students'] unique needs and prepare them for further education, employment, and independent living.'" *Payne*, 653 F.3d at 871 (citing 20 U.S.C. § 1400(d)(1)(A)).

The IDEA does not, however, specify "any substantive standard prescribing the level of education to be accorded handicapped children." *Rowley*, 458 U.S. at 189, 102 S.Ct. 3034. Rather, the IDEA primarily provides parents with various procedural safeguards, including the right to participate in IEP meetings and the right to challenge an IEP in state administrative proceedings and, ultimately, in state or federal court. *Bright*, 725 F.3d at 1095.

On the other hand, the ADA, and specifically Title II's effective communications

regulation, imposes two substantive requirements: First, public entities must "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a); second, public entities must "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." *Id.* § 35.160(b)(1).

The Ninth Circuit, through its comparison of the relevant statutory and regulatory texts, concluded "that the IDEA FAPE requirement and the Title II communication requirements are significantly different. The result is that in some situations, but not others, schools may be required under the ADA to provide services to deaf or hard-of-hearing students that are different than the services required by the IDEA." *Bright,* 725 F.3d at 1100.

However, while the Ninth Circuit distinguished between the ADA and IDEA regimes, it did not· hold that litigation involving the two statutes was wholly independent. It reinforced this fact when it noted that "nothing in our holding should be understood to bar district courts from applying ordinary principles of issue and claim preclusion in cases raising both IDEA and Title II claims where the IDEA administrative appeals process has functionally adjudicated some or all questions relevant to a Title II claim in a way that precludes relitigation." *Id.* at 1101. Thus, the Ninth Circuit recognized the distinct possibility that issues raised in the administrative process could preclude related issues in an ADA proceeding. This factor weighs in favor of recognizing that the administrative proceeding may be considered an extension of the ADA claim

for the purposes of calculating attorney's fees under the statute.

### d. Nature of the Proceedings in Which K.M. Participated

Finally, the Court turns to the specific nature of the proceedings in which K.M. participated in this case. K.M. filed the administrative complaint challenging the June 2009 IEP. "K.M.'s challenge to the June 2009 IEP proceeded to a seven-day hearing before a California administrative law judge." *Bright,* 725 F.3d at 1093. The ALJ concluded Tustin had complied with its procedural and substantive obligations under the IDEA and had provided K.M. with a FAPE. Following that ruling, K.M. filed the complaint in this Court, challenging the ALJ decision and asserting additional ADA and Unruh Act claims, on which she eventually succeeded.

Cementing the fact that the administrative process was indeed part of the ADA proceeding is the fact that the administrative proceedings developed the factual record that was used in the corresponding federal litigation. The Court relied almost exclusively on the record developed through the administrative process in assessing the summary judgment motions. Order, July 5, 2011 (Dkt. 63) at 21 ("At oral arguments, Plaintiff's counsel conceded that there is no additional evidence relevant to the remaining [ADA and Unruh Act] claims that was not considered for purposes of the OAH review."). Reliance on the administrative record in these types of cases is not uncommon. Notably, the Ninth Circuit acknowledged that "[i]n the education context, Title II communications claims may conceivably be more amenable to summary judgment given the extensive factual record that will often have been developed through IEP meetings and administrative appeals." *Id.* at 1103 n. 8

Therefore, the fact that the record from the administrative proceeding was used di-

rectly to support the ADA claims weighs in favor of considering the administrative proceeding a proceeding commenced pursuant to the ADA for the purposes of awarding fees.

### e. Conclusion

Considering the purposes underlying the ADA fee provision, the nature of the enforcement scheme and the IDEA exhaustion requirement, the relationship between the IDEA and ADA claims, and the nature of these proceedings, the Court concludes that "Congress ... intended to authorize awards of attorney's fees to persons in [K.M.'s] situation." *Carey,* 447 U.S. at 61, 100 S.Ct. 2024. Therefore, the Court will consider the hours expended for the administrative proceeding in the lodestar calculation. However, pursuant to *Hensley,* it will modify the lodestar amount to reflect a reasonable fee for the degree of success that Plaintiff ultimately achieved in the litigation.

### C. Calculation of Attorney's Fees

■ In cases where attorney's fees are authorized under federal law, district courts apply a two-step process to calculate the appropriate fee award. *See Fischer v. SJB–P.D., Inc.,* 214 F.3d 1115, 1119 (9th Cir.2000). First, the court must calculate the lodestar figure; multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Charlebois,* 993 F.Supp.2d at 1115. In evaluating what is a reasonable number of hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended. *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1210 (9th Cir.1986), *amended on other grounds,* 808 F.2d 1373 (9th Cir.1987). This amount may be reduced if the hours are duplicative, excessive, or otherwise unnecessary. *Id.* "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of

hours is inadequate, the district court may reduce the award accordingly." *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933.

■ Second, after determining the lodestar figure, the Court may modify the amount based upon factors enumerated in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975):

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

In applying these factors, the Court must keep in mind that "[t]he lodestar amount presumably reflects the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation." *Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 622 (9th Cir. 1993); *see also Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 553, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010) (noting that the lodestar figure includes "most if not all of the relevant factors constituting a reasonable attorney's fee") (internal quotations omitted).

"In order to facilitate appellate review, the district court must clearly articulate sound reasons in support of its fee award." *Intel Corp.,* 6 F.3d at 623.

### 1. Hourly Rate

 Plaintiff seeks $ 475 per hour worked. This rate is supported by · the Declaration of Richard Pearl, an attorney who specializes in issues related to court-awarded attorney's fees. Pearl Decl. (Dkt. 95–2). Defendant does not contest the reasonableness of the hourly rate. Thus, the Court .finds that the hourly rate is reasonable.

### 2. Hours Worked

 The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked. *See Gates v. Deukmejian,* 987 F.2d 1392, 1397 (9th Cir.1992). Under Ninth Circuit law, an attorney " 'is not required to record in great detail how each minute of his time was expended.' " *Lytle v. Carl,* 382 F.3d 978, 989 (9th Cir.2004). Rather, an attorney need only "identify the general subject matter of his time expenditures." *Trustees of Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise,* 234 F.3d 415, 427 (9th Cir.2000).

 Plaintiff seeks recovery for 932.8 hours of work. Plaintiff's counsel has submitted a declaration establishing that the billing records he submitted were made "at or about the time" when the work was performed, and that the time entries "accurately reflect the work" counsel personally performed." Grey Decl. ¶ 6 (Dkt. 95–4). The Court finds that this is sufficient for Plaintiff to meet her burden of proving hours expended in the litigation. The Court has considered Tustin's argument regarding redundant time entries and excessive use of 0.1 billing increments and finds them unpersuasive. For example, drafting statements of fact takes time and attention to detail, and must frequently be modified over time to reflect new evidence or emphasize different points. The fact that counsel has 16 entries devot-ed to the practice, therefore, is neither surprising nor objectionable. Defendant's quibble with the 0.1 hour billing increments is also misplaced. There is no support for the proposition that 106 0.1 hour billing increments over several years of litigation constitutes fee inflation. Most attorneys bill for reviews of emails and notices from the court; only when such increments are used to inflate time (for example, multiple consecutive 0.1 increments in a single day) is a fee reduction appropriate. *See Hernandez v. Taqueria El Grullense,* 2014 WL 1724356, *8–9, 2014 U.S. Dist. LEXIS 61020, *27 (N.D.Cal. Apr. 30, 2014). Plaintiff's counsel did not make a habit out of separately billing such activities. Further, the Court does not find a discount for block billing in this situation appropriate, where, as here, the entries support that the time expended was related to the matters on which Plaintiff seeks fees.

 Plaintiff's travel expenses are also appropriate. Plaintiff bears the burden of establishing that the travel time that he billed for is compensable in the local community. *Jankey v. Beach Hut,* No. CV05–3856 SVW (JTLX), 2006 WL 4569361, at *5 (C.D.Cal. Dec. 19, 2006). Grey has done so in his reply declaration, establishing that it is customary to charge and be paid for travel time attorneys incur on behalf of their clients. Grey Reply Decl. (Dkt. 99–1).

The Court also does not find a 10% reduction for the improper exercise of "billing judgment" appropriate. *Hawkins v. Berkeley Unified Sch. Dist.,* 2008 U.S. Dist. LEXIS 94673, at *39–40 (N.D.Cal. Nov. 20, 2008). In *Hawkins,* the court found that a reduction in fee due to "excessive, redundant, or otherwise unnecessary" hours was appropriate in part because the Court could not conclude that billing judgment was in fact exercised as claimed.

Unlike in *Hawkins,* however, Plaintiff here did quantify the hours he reduced (approximately 200). Further, counsel's billing records do not suffer from the vagueness and duplication identified in *Hawkins. Id.*

### 3. Mitigating Factors

As explained above, "[t]he lodestar amount presumably reflects the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation." *Intel Corp.,* 6 F.3d at 622. However, that amount may be modified upward or downward based on the appropriate factors not accounted for in the lodestar calculation.

### a. Degree of Success

 One factor courts must consider in awarding fees under the lodestar method are the "results obtained" in the litigation. "This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. The *Hensley* Court directed courts to consider two factors in awarding fees in proceedings with mixed success. "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933.

Application of this principle is particularly important in complex civil rights litigation involving numerous challenges to institutional practices or conditions. This type of litigation is lengthy and demands many hours of lawyers' services. Although the plaintiff often may succeed in identifying some unlawful practices or conditions, the range of possible success is vast. That the plaintiff is a "prevailing party" therefore may say little about whether the expenditure of counsel's time was reasonable in rela-

tion to the success achieved. In this case, for example, the District Court's award of fees based on 2,557 hours worked may have been reasonable in light of the substantial relief obtained. But had respondents prevailed on only one of their six general claims, for example the claim that petitioners' visitation, mail, and telephone policies were overly restrictive,[ ] a fee award based on the claimed hours clearly would have been excessive.

*Id.* at 436, 103 S.Ct. 1933. Considering the amorphous nature of this assessment, "there is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Hensley,* 461 U.S. at 436–37, 103 S.Ct. 1933.

 Under *Hensley,* the Court must account for the mixed success that Plaintiff had in this lawsuit in equating the appropriate amount of fees to award. K.M. unequivocally lost on her IDEA and FAPE claims—she was determined not to have a right to CART under the relevant provisions, which was a major part of her federal case and the exclusive focus of the administrative proceeding. Awarding fees for all the time spent on the case, including legal argument for clearly unsuccessful positions, would therefore result in an excessive fee award. After reviewing the billing records and underlying court proceedings, it is clear that much of the time in those cases was devoted to legal argument that did not advance and was not related to the successful claims. For example, in the Plaintiff's motion for summary judgment, significant attention was devoted to argument that the administrative law judge

erred in rejecting CART for K.M. Pl. Mot. (Dkt. 15) at 16–25.

This is not to say that Plaintiff's success on the ADA and Unruh Act claims was not substantial and notable. Specifically, the Ninth Circuit considered a novel issue and ruled in K.M.'s favor, opening the door to relief that had previously been foreclosed. The decision resulted in a substantial financial settlement and allowed, potentially, greater access to educational assistance for disabled children in other cases. K.M.'s success on her ADA and Unruh Act claims relied in part on the administrative record preceding their litigation.

Balancing the degree of her success on the multiple claims, however, the Court finds that the moderate success she achieved does not justify the full number of hours sought for litigating all of the claims in this action.

The Court has considered the expert declaration of John O'Connor (Dkt. 98–1), Defendant's attorney's fee expert, and Mr. Grey's declaration, and finds the fees should be awarded as follows:

- For the administrative proceeding: 50% of the fees are recoverable, given the fact that, while the administrative proceeding was related to and involved overlapping facts with the ADA claim, leading to a development of the factual record, Plaintiff was unsuccessful in achieving relief under the IDEA and in her request for CART. O'Connor Decl. ¶ F. Plaintiff did not challenge the IDEA decision on appeal. Much of Plaintiff's counsel's time expended on the IDEA administrative proceedings was not reasonably necessary to achieve success on the ADA claim, meriting a proportional reduction in fees.
- For the district court proceedings, including investigating and drafting the complaint, leading up to and including summary judgment: 75% of the fees

are recoverable. This is due to the fact that the complaint included claims under both the IDEA and the ADA, much of the litigation at the district court level was devoted exclusively to IDEA/FAPE liability theories, and that Plaintiff succeeded substantively only as to the ADA claim. For example, half of the summary judgment motion was devoted to legal argument regarding the fact that the administrative law judge erred in finding in the district's favor. These arguments are clearly distinct from the ADA claim and unnecessary to Plaintiff's ultimate success, justifying the proportional reduction.

- For the appeal and all subsequent proceedings, including the attorney's fees briefing: 100% of the fees are recoverable.

### b. Upward Adjustment

 The Court has considered the arguments raised by K.M. as to factors otherwise meriting an upward adjustment to the lodestar rate, and none are availing. The lodestar rate, as modified based on the degree of success in the action, sufficiently accounts for counsel's efforts in this suit. Only in "rare and exceptional cases" may the court adjust the lodestar upward using a multiplier based on facts not subsumed in the initial lodestar calculation. *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir.2007).

 Plaintiff argues that, under state law, she is entitled to a contingency fee multiplier. *Ketchum v. Moses,* 24 Cal.4th 1122, 1132, 104 Cal.Rptr.2d 377, 17 P.3d 735 (2001). "Of course, the trial court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk." *Id.* at 1138, 104 Cal.Rptr.2d 377, 17 P.3d 735. Plaintiff has not presented compelling reasons for a contingent enhancer.

*Id.* at 1136, 104 Cal.Rptr.2d 377, 17 P.3d 735. Further, *City of Burlington v. Dague* draws into question the logic of such an award, even if permitted by the California statute. 505 U.S. 557, 563, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

Plaintiff also lists a variety of other factors the courts may consider in awarding a fee enhancement. However, the Court finds that Plaintiff has failed to meet her burden of proof in establishing such a payment is appropriate in this situation, considering especially the limited overall success in the suit.

## IV. COSTS

Plaintiff provided evidence to support costs in the amount of $15,282.58. The Court has reviewed the material and finds the costs reasonable and related the present litigation. Defendant has not specifically challenged the amount of costs. Therefore, the Court awards costs in their full amount.

## V. DISPOSITION

For the reasons set forth above, the Motion for Fees is GRANTED IN PART. The Court finds the hourly fee and number of hours worked to be supported by sufficient evidence, however, a downward modification as to certain stages of the litigation is warranted given the limited success Plaintiff achieved.

- Administrative proceedings: 234.2 hours × $475/hour × 50% multiplier = $ 55,622.50
- District court proceedings: 385.8 hours × $475/hour × 75% multiplier = $ 137,441.30
- Appeal and post appeal work: 312.8 hours × $475/hour × 100% multiplier = $ 148,580
- Reply work: 26.7 hours × $475/hour × 100% multiplier = $12,682.50
- Costs = $15,282.58

Therefore, the Court awards fees in the amount of $ 369,608.80.